## HENSHAW ET AL. *v.* BISSELL.

1. In an action of ejectment, where both parties claim the premises in controversy under patents of the United States issued upon a confirmation of grants of land in California made by the former Mexican government, both of which patents cover the premises, the inquiry of the court must extend to the character of the original grants, and the controversy can only be settled by determining which of these two gave the better right to the premises.

2. In determining such controversy a grant of land identified by specific boundaries, or having such descriptive features as to render its identification a matter of absolute certainty, gives a better right to the premises than a floating grant, although such floating grant be first surveyed and patented.

3. *Semble*, that as between two floating grants of quantity within the same general tract which is sufficiently large to satisfy both, where neither grantee had received official delivery of possession under the former government, and where, as a consequence, there was no measurement or severance of the claim of either from the public domain, the party whose claim is first surveyed and patented will hold the better right to the land covered by his patent, and that the other party will be compelled to have his claim located outside of that patent.

4. The present case distinguished from cases in this court, and in the Supreme Court of California, in which imperfect or equitable claims, or interests arising since the acquisition of the country, were set up against the legal title held under patents.

5. A survey under a grant approved by the District Court of the United States under the act of June 14th, 1860, is conclusive as against adverse claimants under floating grants.

6. Whilst proceedings are pending before the tribunals of the United States for the confirmation of claims to land under grants of the former Mexican government, the statute of limitations of California does not run against the right of the claimants to the land subsequently confirmed to them. That statute only begins to run against the title perfected under the legislation of Congress from the date of its consummation.

7. For the application of the doctrine of equitable estoppel, such as will prevent a party from asserting his legal rights to property, there must be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud. Accordingly, when a claimant under a Mexican grant located his claim on land different from that which was finally surveyed and patented to him, and announced to others that his claim covered the land thus selected, but the government interfered and located the claim elsewhere, *held*, that he was not estopped from asserting a right to the premises surveyed and patented to him.

ERROR to the Circuit Court for the District of California.

Bissell brought ejectment in the court below against Henshaw and others, to recover one league square of land, situated in the county of Butte, in the State of California. The action was commenced May 15th, 1857, and was tried by the court without a jury by stipulation of the parties. The material facts of the case were as follows:

On the 24th of March, 1852, one Larkin, pursuant to the provisions of the act of Congress of March 3d, 1851, entitled "An act to ascertain and settle private land-claims in the State of California," filed a petition with the board of land commissioners created under the act, praying a confirmation of a claim made by him to a tract of land containing four square leagues of land, situated in the county of Butte, in the State of California, his claim being founded on a Mexican grant made by Governor Micheltorena to Charles William Flugge on the 21st day of February, A. D. 1844, upon his petition bearing date on the 22d of December, A. D. 1843. Flugge, in his petition, described the land solicited as "situated on the western side of Feather River, and stretching along ('sobre.') the said river from 39° 33' 45" northern latitude, to 39° 48' 45", and forming on this line a square one league in breadth. It is called Boga, as it is rendered manifest by the adjoining sketch." The grant described the land granted as "consisting of five sitios ganado mayor [square leagues], situate on the westerly side of Feather River, in the centre of which there is a piece of land called Boga, the first boundary of the said land beginning at 39° 33' 45" degrees north latitude, as appears from the corresponding plan." The grant was made subject to the approval of the Departmental Assembly, and was approved by that body June 13th, 1845. The map accompanying the petition, called "sketch" or "plan" in the translation, in the record, lays down the line of latitude intended as the first boundary of the tract, and designates it by the degree of latitude specified in the petition and grant. The designation of this line turned out to be inaccurate; the degree of latitude mentioned being several leagues farther north. There was,

however, no difficulty in fixing the line intended on the surface of the earth by measurement, from the junction of the two rivers Sacramento and Feather, which was several leagues south, and which junction was marked by a line designated by a degree of latitude containing a similar error.

The natural objects indicated on the map—Feather River, which was the eastern boundary, and a creek called Honcut, emptying into Feather River, and three conspicuous peaks in the immediate neighborhood called "The Three Buttes,"—rendered the identification of the tract a matter easy to any surveyor. Notwithstanding these natural objects Larkin, the claimant, who had acquired the interest of the grantee, contended that the parallel of latitude designated should govern the location of the land, and accordingly he selected the land he desired under the grant, several leagues farther north than the line actually intended, and finally adopted by the government. The surveyor-general of California made a survey of the tract for the information of the land commission before confirmation, and in that survey he committed a similar error. Subsequent to the confirmation he made another survey following substantially the preliminary one. With both the surveys thus made Larkin was satisfied, and he stated to persons inquiring, that his claim under the grant covered the land selected by him and thus surveyed. The grant was confirmed by the board on the 17th of July, 1855; and an appeal from its decree having been taken by the United States, the attorney-general gave notice that the appeal would not be prosecuted; and on the 9th of February, 1857, the appeal was dismissed by the District Court, and the claimant allowed to proceed upon the decree of the board as upon a final decree.

The survey of the tract made by the surveyor-general of California, as above stated, under this decree, was set aside by the Commissioner of the General Land Office, and a new survey ordered. A new survey was accordingly made, and being objected to was ordered into the District Court for

examination under the act of June 14th, 1860.*  This act authorizes the court " to make an order requiring any survey of a private land claim . . . to be returned into it for examination and adjudication," and makes it " the duty of the surveyor-general to transmit said survey and plat forthwith to said court."  It requires " that before proceeding to take the testimony or to determine on the validity of any objection so made to the survey and location as aforesaid, the said courts shall cause notice to be given by public advertisement, or in some other form to be prescribed by their rules, *to all parties in interest,* that objection has been made to such survey and location, *and admonishing all parties in interest to intervene for the protection of such interest.*"  It enacts further that " on hearing the allegations and proofs the court shall render judgment thereon ; and if, in its opinion, the location and survey are erroneous, it is hereby authorized to set aside and annul the same, or correct and modify it; and it is hereby made the duty of the surveyor-general, on being served with a certified copy of the decree of said court, forthwith to cause a new survey and location to be made, or to correct and reform the survey already made, so as to conform to the decree of the District Court, to which it shall be returned for confirmation and approval."  An appeal is given to the Supreme Court.

Under this act such proceedings were had that on the 15th of January, 1863, a new survey was approved by decree of the District Court, which became final, June 26th, 1865, by dismissal of an appeal taken therefrom.  A patent of the United States was issued for the land, in accordance with this survey, to the claimant, October 5th, 1865.  The plaintiff deraigned by due conveyances from the heirs of the patentee an undivided three-fourths interest in the premises patented, which include the land in controversy.

On the 19th of March, 1852, Dionisio Fernandez, Maximo Fernandez, J. Beeden, and W. R. Basham, filed a petition,

---

* 12 Stat. at Large, 33.

under the act of 1851, with the board of land commissioners, praying a confirmation of a claim made by them to a tract containing four square leagues of land situated in the county of Butte, and State of California, their claim being founded on a Mexican grant made by Pio Pico, governor of California, to Maximo and Dionisio Fernandez, on the 12th day of June, A. D. 1846. The grant describes the land granted as " a tract of unoccupied land, in the vicinity of the river Sacramento, bounded on the north by the slopes [*faldas*] of the Sierra Nevada; on the south by John A. Sutter's lands, and on the east by Feather River," consisting of four square leagues, and refers to a plan or map accompanying the petition of the grantees. This map represents the land as lying on Feather River, with its northern boundary resting on the *faldas* of the Sierra Nevada mountains, but with no other descriptive features to indicate its northern or southern boundary. The grant was subject to the approval of the Departmental Assembly, but never received such approval. The country passed into the possession of the United States in the following month, July 7th, 1846. Between the slopes or base of the mountains and the line of Sutter's land many leagues intervened.

The grant was confirmed by the board of land commissioners July 17th, 1855, and its decree was affirmed by the District Court on appeal March 2d, 1857. The attorney-general having given notice that no further appeal would be prosecuted, the District Court entered an order, on the ninth of the same month, that the claimants be allowed to proceed under the decree of March 2d as a final decree.

A survey of the tract confirmed was made under the directions of the surveyor-general, and was approved by him on the 29th of May, 1857. This survey was also approved by the Commissioner of the General Land Office; and on the 14th of October, 1857, a patent of the United States, in accordance with it, was issued to the claimants. This patent covers the premises in controversy, and the defendants have acquired the interests of the patentees, and have been in the open, continuous, exclusive, and adverse possession of

the premises since 1852, claiming title under the Mexican grant, proceedings for confirmation, and patent of the United States.

The statute of limitations of California, passed in 1863, enacted that no action for the recovery of real property, or its possession, should be maintained, unless the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises within five years before the commencement of the action, with a *proviso* in substance to the effect that parties claiming real property under title derived from the Spanish or Mexican governments, or the authorities thereof, which had not been finally confirmed by the United States, or its legally constituted authorities, should be limited to five years after its passage, within which to bring an action for the recovery of the property or its possession, but if the title had been thus finally confirmed, the parties should be subject to the same limitations as though they derived their title from any other source, that is, they should have five years from such final confirmation. The statute, in another section, declared that by *final confirmation* was meant the patent of the United States, or the final determination of the official survey of the land under the act of Congress of June 14th, 1860. The proviso has since then been repealed, but before the repeal the present action was brought.

The Circuit Court gave judgment for the plaintiff for the premises, and the defendants brought the case to this court on writ of error for review.

*Messrs. R. M. and Q. Corwine, for the plaintiffs in error :*

1st. The patent of the United States first issuing to Henshaw and the others gave to them paramount title, at law and in equity, to the land in controversy. This is settled in *Beard* v. *Federy*,[*] *Waterman* v. *Smith*,[†] *Moore* v. *Wilkinson*,[‡] *Stark* v. *Barrett*,[§] *Estrada* v. *Murphy*,[||] *Leese* v. *Clark*,[¶] and *Biddle Boggs* v. *Merced Mining Co.*[**]

---

[*] 3 Wallace, 479.     [†] 13 California, 407.    [‡] Ib. 488.
[§] 15 Id. 366.    [||] 19 Id. 260.    [¶] 18 Id. 587.
[**] 14 Id. 362.

2d. The act of June 14th, 1860, providing as it does that a citizen may be deprived of his property by a proceeding to which he is not a party, is unconstitutional, and the proceedings of the District Court in the case of Larkin, *after* the order dismissing the case, and remitting it and the parties to the board of land commissioners for final action, to wit, on the 9th of February, 1857, were void and inoperative, and do not amount to an estoppel against the defendants. The whole subject of surveys is under the control of the political department of the government, and not subject to management by the courts.

3d. The statute of limitations of California, which was pleaded by the defendants, is a complete bar to this action, and should have been so found by the Circuit Court.

4th. The conduct of Larkin, from whom the plaintiff deraigns title with respect to the land in controversy, prior to and at the time the title to the same was confirmed in those under whom the defendant claims, and subsequently, was in fact and did in law amount to an estoppel of Larkin and those claiming under him.

*Messrs. M. Blair and F. A. Dick, contra.*

Mr. Justice FIELD delivered the opinion of the court.

This is an action of ejectment for the possession of certain real property situated in the county of Butte, in the State of California. Both parties claim the demanded premises under patents of the United States, issued upon a confirmation of grants made by the Mexican government. The plaintiff claims under the junior patent issued upon the earlier grant; the defendants claim under the senior patent issued upon the later grant. Both patents cover the premises in controversy, one square league of land, and the main question in the case, as in all cases where patents founded upon previously existing concessions overlap, is which of the two original concessions carried the better right to the premises.

The question, as here presented, arising upon conflicting

patents issued upon confirmed Mexican grants, has not been, heretofore, before this court for consideration, but the principles which must govern its determination are neither new nor difficult.

The grant to Flugge, upon the confirmation of which the patent was issued, from which the plaintiff deraigns his title, was made by the governor of California in February, 1844, and was approved by the Departmental Assembly in June, 1845. It in terms ceded to the grantee, subject to such approval and other conditions, five square leagues of land situated on the westerly side of Feather River, as represented on a map which accompanied the petition of the grantee, and designated as the first boundary of the tract a certain degree of north latitude. This designation afterwards proved to be erroneous, but the line intended was susceptible of being accurately traced by measurement from the junction of Feather and Sacramento Rivers, which was marked on the same map by a degree of latitude containing a similar error. The map represented a tract stated in the petition, and the statement was accepted and acted upon by the governor as correct, to be one league in breadth, and indicated natural objects of such marked character as to make the identification of the land a matter perfectly easy to any surveyor. Feather River, which constitutes the eastern boundary, with its meanderings, is traced; the position of Honcut Creek entering the river is given, and the point on the river where the erroneously designated line of latitude crosses, constituting the commencement of the boundary, is plainly shown by the bend of the river. With the breadth of the tract stated, the quantity limited, the southern and eastern lines designated, all the elements are given essential to the complete identification of the land. A grant of land thus identified, or having such descriptive features as to render its identification a matter of absolute certainty, entitled the grantee to the specific tract named. His title, it is true, was imperfect in its character, and subject to various conditions, but when approved by the Departmental Assembly it became, in the language of the regulations of 1828, "defini-

tively valid," and the estate granted was not afterwards liable to be divested except by regular proceedings on denouncement.* The power of the governor over it had ceased. He could neither revoke the grant nor impair the interest of the grantee by any attempted transfer to others.

The grant to the Fernandez, upon the confirmation of which the patent was issued, from which the defendants trace their title, was made by the governor of California in June, 1846, but was not submitted to the Departmental Assembly for approva., although made subject to that condition. The country passed under the control of the United States a few weeks afterwards, and the authority of that body ceased. The grant is for four square leagues of land, which it designates as unoccupied land, in the vicinity of the river Sacramento, and as bounded on the north by the *faldas* of the Sierra Nevada, a term which is sometimes translated slope and sometimes base of the mountains; on the south by the lands of John A. Sutter, and on the east by Feather River. As thus appears, there was no certainty or precision in the boundaries designated. The term slope or base of the mountains, whichever may be the correct translation, is of the vaguest import. The point where the mountains of the Sierra Nevada may be said to commence was then, and always must be, one of great uncertainty. No two persons would ever agree as to the precise point where their slope commenced or ended. Between the base, or any supposed slope, and the line of Sutter's land, many leagues intervened, and no western boundary of the tract is given. If we look at the map to which the grant refers we find the land represented as lying on Feather River, with its northern boundary on the "faldas" of the Sierra, with no other descriptive features to indicate either its northern or southern line. It is clear that no specific tract was intended by the governor, but only that the quantity designated should be selected on Feather River, at the base or along the side of the mountains, the precise line of which was to

---

•* Hornsby *v.* United States, 10 Wallace, 238.

be determined by the magistrate delivering possession to the grantees. As a grant of quantity it required, under the Mexican laws, such delivery of possession to attach it to any particular tract, called, in the language of the country, juridical possession, and that proceeding was never had. But it is immaterial for the disposition of the present case whether the grant to the Fernandez be treated as one of specific boundaries, or of quantity; it could not interfere with and displace a prior grant of defined boundaries.

On the argument great stress was placed by counsel upon the fact that the claim under the Fernandez grant, though later in date, was first surveyed and patented. But this fact is not a matter of any weight in this case. Both parties holding under patents have a standing in a court of law, and the court is thus compelled to look beyond the patents, to the original source of title, and to the character of that title as it existed under the former government. The protection which by the treaty the United States promised to the grantees extended to rights which they then held. The confirmation established the validity of the claims of the parties as they then existed; that is, it determined that their claims were founded upon concessions of the former government, which were genuine and entitled to recognition so far as they did not interfere with previously existing rights of others, which the government was also bound to respect. Confirmation established nothing more; it did not change the character of the grant to Flugge as one of specific boundaries, nor that to the Fernandez as one of quantity. The surveyor in surveying the claim upon the first grant was still under as great obligations to follow the boundaries which it specified, repeated in the decree of confirmation, as though the second grant had never been issued or confirmed.

It is true, as stated by counsel, that the whole subject of surveys is under the control of the political department of the government, and is not subject to the supervision of the courts, except in those cases arising under the act of 1860, to which we shall presently refer. The courts must, how-

ever, determine, whenever the question arises, whether prior rights of other parties have been interfered with by the survey of a confirmed claim upon which a patent has issued. They cannot, in the action of ejectment, correct the survey made, but they can determine its inconclusiveness to the extent essential to the protection of the prior rights of other parties. And whenever two surveys covering the same tract are approved by the political department, and a legal controversy arises respecting the land between claimants under the different surveys, the question which of the two surveys appropriates the premises in dispute is necessarily transferred to the judiciary. The fact that two surveys embrace the same land is itself proof that either one of the original concessions was improvidently issued and to the extent of its interference with the other was inoperative, or that error has intervened in one of the surveys.

There is nothing in the language of this court, or of the Supreme Court of California, in the several cases cited by counsel, which conflicts with this view.* Those cases were all actions of ejectment, in which imperfect or equitable claims, or interests arising since the acquisition of the country, were set up against the legal title held under patents; and the subjects there considered were the effect of the patent as a conveyance of the government, and as evidence of the validity of the patentee's claim, and of its confirmation and survey, as against parties having such imperfect or mere equitable claims, or subsequently acquired interests. The patent, treated merely as the deed of the government, is held in those cases to have the operation of a quit-claim, or rather of a conveyance of such interest as the United States possessed in the land, and to take effect by relation at the time when proceedings were instituted before the board of land commissioners. The patent is also held in those cases to be record evidence of the action of the government upon the claim of the patentee under the Mexican grant,

---

* Beard v. Federy, 3 Wallace, 479; Waterman v. Smith, 13 California, 407; Moore v. Wilkinson, Ib. 488; Stark v. Barrett, 15 Id. 366; Teschemacher v. Thompson, 18 Id. 26; Leese v. Clark, Ib. 537.

establishing without other proof the validity of the claim and its rightful location as against all parties asserting, in the action of ejectment, merely imperfect or equitable titles, or interests acquired since the country passed under the jurisdiction of the United States. Actions of ejectment are founded upon the legal title, and parties contesting the title of the patentee in a court of law, it is there said, must show a superior legal title.

But in this case both parties stand upon patents; both have in these instruments the conveyance of the government, and a recognition of their respective concessions under the former government. In a controversy founded upon either patent as against imperfect or equitable claims or interests obtained since the acquisition of the country, the same language might be repeated which is used in the cases cited. But in the present controversy between parties claiming under two patents, each of which reserves the rights of other parties, the inquiry must extend to the character of the original concessions. The controversy can only be settled by determining which of these two gave the better right to the demanded premises.

As between two floating grants of quantity within the same general tract, which is sufficiently large to satisfy both, where neither grantee had received official delivery of possession under the former government, and where, as a consequence, there was no measurement or severance of the claim of either from the public domain, it may be that the party whose claim is first surveyed and patented will hold the better right to the land covered by his patent, and that the other party will be compelled to have his claim located outside of that patent. There would be great difficulty in finding any legal reason for invalidating the action of the government in locating the claim of the patentee in such case in any part of the general tract it might deem proper.

The language of this court in Fremont's case would seem to justify the conclusion that the floating claim first surveyed, and thus severed from the public domain, would carry the title to the premises. The grant to Alvarado, which was

then under consideration, was for ten leagues lying within exterior boundaries embracing several times the quantity designated; and the court, whilst holding that, as between the government and the grantee, the grant passed to the latter a right to the quantity of land designated, to be laid off by official authority in the territory described, said: " It is true that if any other person within the limits where the quantity granted to Alvarado was to be located had afterwards obtained a grant from the government, by specific boundaries, before Alvarado had made his survey, the title of the latter grantee could not be impaired by any subsequent survey of Alvarado. As between the individual claimants from the government, the title of the party who had obtained a grant for the specific land would be the superior and better one. For by the general grant to Alvarado, the government did not bind itself to make no other grant within the territory described until after he had made his survey."* A second floating grant, the claim under which is first surveyed and patented, and thus severed from the public domain, would seem to stand, with reference to an earlier floating grant within the same general limits, in the position which the subsequent grant with specific boundaries mentioned in the citation would have stood to the general grant to Alvarado.†

But it is unnecessary to decide definitely this point now. The present is not a case of conflicting patents issued upon a confirmation of two floating grants within exterior boundaries embracing land capable of satisfying both. It is a case where one of the grants upon which a patent has issued, and that the earlier one, has specific boundaries, or such descriptive features as to render its limits easily ascertainable. With the right of the grantee to the land thus designated the claim of the donee of the second and floating grant could not interfere.

But there is another view of this case which is equally.

---

* 17 Howard, 558.

† Ledoux v. Black, 18 Id. 475; Waterman v. Smith, 13 California, 416, 417.

conclusive in favor of the plaintiff.   We have thus far treated the survey of the two grants upon which the respective patents were issued, as made and approved under the act of March 3d, 1851.   But the survey of the claim under the Flugge grant possesses, with respect to the claim under the Fernandez grant, greater force than any such approval could give.   It has received judicial sanction under the act of June 14th, 1860, which makes it conclusive as against all adverse claimants under floating grants.   That act provided that the surveyor-general, when he had completed and plotted the survey of any confirmed claim, should give public notice of the fact by publication in two newspapers once a week for the period of four weeks; that during this time the survey and plat should be retained in his office subject to inspection; that upon the application of any party having such an interest in the survey and location of the land as to make it just and proper that he should be allowed to intervene for its protection, or on motion of the United States, the District Court should order the survey and plat to be returned into court for examination and adjudication; that when thus returned notice should be given by public advertisement, or in some other form prescribed by rule, to all parties interested, that objection had been made to the survey and location, and admonishing them to intervene for the protection of their interests; that such parties having intervened, might take testimony and contest the survey and location; and that on hearing the allegations and proofs, the court should render its judgment approving the survey, if found to be accurate, and correcting it or ordering a new survey when found to be erroneous.   The act also provided for an appeal from the decree of the District Court to the Supreme Court.

By the proceedings thus authorized, the approval of the survey brought before the court had, as against claimants under floating grants, the force and conclusiveness of a judicial determination in a suit *in rem*, and all such claimants were concluded by it.

The survey of the claim under the Flugge grant was, under the act in question, brought before the District Court

and there subjected to judicial examination, and finally received the approval of the court. If the defendants or those under whom they hold failed to appear and contest the survey, they cannot now be heard in this action to question its correctness.*

The objection to the authority of the court to pass upon the survey, because ordered into court before the act of June 14th, 1860, is untenable. The act in terms applies to surveys which had been previously returned into court and in relation to which proceedings were then pending, as well as to surveys subsequently made.†

Nor does it matter that a different survey had been previously approved by the surveyor-general of California. The whole subject of surveys is under the control of Congress, and until the patent issues thereon, any survey may be set aside and a new one ordered by its authority.

But the defendants, to defeat a recovery by the plaintiff, also insist that his right of action is barred by the statute of limitations of California; and also that he is estopped from asserting a claim to the demanded premises by the conduct and declarations of his predecessor, the claimant before the land commission, in claiming land under his grant situated in a different locality.

The statute of limitations of California, passed in 1863, provided in substance that no action for the recovery of real property or its possession should be maintained, unless the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises within five years before the commencement of the action, or the property was claimed under title derived from the Spanish or Mexican governments, which had not been previously confirmed by the United States or their legally constituted authorities; in which latter case the parties were allowed five years after the passage of the act within which to bring their action. If the title had been thus finally confirmed the parties were limited to five years after such confirmation. The statute also de-

---

* Rodrigues v. United States, 1 Wallace, 591.

† United States v. Halleck, Ib. 453.

clared that by final confirmation was meant the patent of the United States, or the final determination of the official survey of the land under the act of Congress of June 14th, 1860. The provision of the statute relating to actions where the property is claimed under title derived from Spanish or Mexican authorities, has since then been repealed; but before the repeal and within the time designated after final confirmation of the grant, the present action was commenced. The repeal could not, however, have any effect upon the rights of the plaintiff.

Whilst proceedings were pending before the tribunals of the United States for the confirmation of the claim under the Flugge grant, the statute did not run and could not run against the right of the claimant to the land in controversy. He was obliged by the legislation of Congress to present his claim for investigation and determination, under pain of being held to have abandoned it, and was subjected to numerous and expensive proceedings to establish its validity. As a result of the proceedings required, the government, in effect, promised, in case his claim was found to be valid, to give him in its patent such evidence of title as would secure to him the possession and enjoyment of his land. The legislation of Congress imposing this burden upon the claimant and promising this benefit to him, is not the subject of any constitutional objection, and it is not, therefore, within the power of the legislature of a State to defeat its operation. It was adopted by the government in the discharge of its treaty obligations, with respect to which its authority is absolute and supreme. The action of the government thereunder, and the rights which perfected title insures to its possessor, cannot be impaired or defeated in any respect by the statute of limitations of the State. That statute can only begin to run against the title perfected under the legislation of Congress from the date of its consummation.*

The alleged estoppel of the plaintiffs is asserted from the fact that Larkin, who prosecuted the claim under the

---

* Montgomery v. Bevans, 1 Sawyer, 680.

Flugge grant for confirmation, had previously located it on land selected farther north than the tract finally surveyed and patented to him, and had announced to others that his claim covered the land thus selected. It was undoubtedly his desire to have his claim located where he had placed it. The survey made by the surveyor-general, both preliminary and subsequent to the confirmation, placed the land in the same locality. Both claimant and surveyor seem to have acted on the supposition that the erroneously designated parallels of latitude should govern the location, instead of the natural boundaries indicated on the map. There does not appear to have been any intention on the part of Larkin to mislead any one as to the nature of his rights. He was satisfied to keep the land originally selected by him; and he contended, and those who succeeded to his interests contended for the correctness of his selection; but the government, through its appropriate officers, interfered and asserted that another and different location was required by the grant.

There is, therefore, no case for the application of the doctrine of equitable estoppel. For its application there must be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud.

An estoppel *in pais* is sometimes said to be a moral question. Certain it is that to the enforcement of an estoppel of this character, such as will prevent a party from asserting his legal rights to property, there must generally be some degree of turpitude in his conduct which has misled others to their injury. Conduct or declarations founded upon ignorance of one's rights have no such ingredient, and seldom work any such result. There are cases, it is true, where declarations may be made under such peculiar circumstances, that the party will be estopped from denying any knowledge of his rights; but these are exceptional, and do not affect the correctness of the general rule as stated.*

* Commonwealth *v.* Moltz, 10 Pennsylvania, 531; Copeland *v.* Copeland, 28 Maine, 529; Whitaker *v.* Williams, 20 Connecticut, 104; Delaplaine *v.*

We see no ground for interfering with the judgment of the Circuit Court, and it is, therefore,

AFFIRMED.

---

Hitchcock, 6 Hill, 16; Brewer *v.* Boston and Worcester Railroad Company, 5 Metcalf, 479; Biddle Boggs *v.* Merced Mining Company, 14 California, 368; Davis *v.* Davis, 26 Id. 23.