### HARRISON *v.* ULRICHS *et al.*

*(Circuit Court, S. D. California. August 12, 1889.)*

1. EJECTMENT—EVIDENCE.

In an action of ejectment for land in California, where both parties assert title to the premises under patents of the United States, issued upon concessions of former governments, confirmed by the tribunals of the United States, the controversy can only be determined by reference to those concessions, or by the proceedings had for their recognition and confirmation under our government.

2. PUBLIC LANDS—TERRITORY OF UPPER CALIFORNIA—ISSUE OF PATENTS.

A grant made by the superior political chief of the territory of Upper California, in conformity with the colonization law of Mexico of 1824, and the executive regulations of 1828, followed by the ceremony of juridical possession, by which, after citation to the neighboring proprietors to be present at the proceeding, the land was measured, its boundaries marked, and the grantee put in possession, vested the title in fee in the grantee, subject only to the possibility of its being divested by the refusal of the departmental assembly to give its approval to the grant. A patent of the United States, issued upon a title of that character, confirmed by the tribunals of the United States, and located by the executive officers of the United States, is unaffected by a subsequent patent, based on a confirmation of a title depending upon the validity of an order made by a governor of California, commissioned by the Spanish crown, which order did not in itself convey any interest in the land, and was not followed by any proceeding which purported to have that effect.

3. ADVERSE POSSESSION — RUNNING OF STATUTE AGAINST THE SPANISH CROWN.

Under the law of Spain and Mexico, mere possession, however long continued, of any portion of the public domain, under an instrument which did not purport to transfer the property, did not create a title which would enable the possessor to hold the land against the Spanish crown or against the Mexican government.

4. PUBLIC LANDS—MEXICAN GRANTS.

Under the regulations of Mexico of 1828 it was the duty of the governor, and not of the grantee, to submit to the departmental assembly grants issued by him, for their approbation. His neglect in this respect suspended the definitive validity of the grant; that is, prolonged the liability of the estate to be defeated by the action of the assembly and of the supreme government thereon, but did not operate to divest the estate already vested in the grantee.

5. SAME—ISSUE OF PATENTS.

By a patent issued by the United States upon a grant made in conformity with the colonization law of 1824, followed by the ceremony of juridical possession, confirmed and located by the United States, whatever title is in the United States passes to the patentee. After a patent so issued, no title remains in the United States which they could convey by any subsequent patent. However conclusive against the United States, and parties claiming un-

der them by title subsequent, a patent may be, it in no respect impairs the right of a previous patentee to contest the title upon which the subsequent patent has issued for the premises.

6. SAME—POWER OF SPANISH POLITICAL CHIEF.
Whether the political chief of the territory of Upper California, under the the Spanish crown, possessed any power to alienate the fee of any portion of the public doman, doubted.

(*Syllabus approved by the Court.*)

At Law.   Action of ejectment.

*William Matthews* and *Wells, Van Dyke & Lee,* for plaintiff.

*Rhodes & Barstow, Chapman & Hendricks,* and *J. W. Towner,* for defendants.

Before FIELD, Justice, and SAWYER, Circuit Judge.

FIELD, Justice.   This is an action for the possession of land in the county of Los Angeles, Cal., amounting to 13,723 acres and a fraction of an acre.   It is submitted to the court without the intervention of a jury, by stipulation of the parties.   The complaint alleges ownership in fee of the demanded premises by the plaintiff on the 1st day of July, 1886, and the wrongful and continued exclusion of him from them ever since by the defendants, to his damage of $10,000.   The answers controvert all the allegations of the complaint, and also plead the statute of limitations in bar of the action.   No testimony was offered in support of this plea, and it must therefore be considered as abandoned.

The plaintiff deraigns whatever title he possesses to the land by two patents of the United States, each for an undivided half of a tract known as the "Rancho Las Bolsas,"—one issued June 19, 1874, to Ramon Yorba and others; the other issued August 27, 1877, to Juan Jose Murillo and his wife.   Both of these patents embrace the demanded premises.   The defendants who have not disclaimed, or against whom the action has not been dismissed, were in possession of the premises at the commencement of the action, and claim title to them through a patent of the United States issued December 21, 1883, to Bernardino Yorba and others, for a tract known as the "Rancho Santiago de Santa Ana."   This patent also embraces the demanded premises.

As the patents of both parties cover the land, the controversy can only be determined by reference to the concessions of the former government, or by the proceedings for their recognition and confirmation taken under our government.   The patents are based upon the supposed validity of the asserted title or equity of the patentees when the jurisdiction of Mexico passed to the United States.   Whoever previously possessed the better right to the possession of the lands would have been maintained by the government of that country in his claim against contestants, and those who have succeeded to that better right are entitled, under our government, to the like protection.   The patents were not issued until those concessions had been recognized by the tribunals of the United States as genuine, and as conferring a right or equity upon the respective claimants, which was entitled to protection under the act of March 3, 1851. It was not the purpose of that act, or of the proceedings under it, to su-

persede rights or equities relating to lands conferred by the former government, but to confirm and perfect them by giving the holder such record or documentary evidence of their validity as would enable him to enforce them in the courts of the country. We must, therefore, look into the character of those concessions, and, if they furnish no solution of the matter in contention, we must consider the effect of proceedings had before the the the tribunals of the United States upon their respective pretensions. *Henshaw* v. *Bissell*, 18 Wall. 255, 266. Nearly all the original documents issued by the former governments, or certified copies thereof, have been produced in evidence, as well as attempted translations of them. These translations, it is true, are in bad English, and are often inaccurate. We cannot, however, be misled by them, for we have the originals or copies to which we can refer to verify or correct them. Turning to those concessions, and looking first to those produced on behalf of the plaintiff in support of his contention, we find the facts to be substantially as follows:

In 1784 one Manuel Nieto, a subject of Spain, obtained from Pedro Fages, then military governor or comandante of California, under the Spanish crown, a concession of some kind relating to a large tract of land within the present county of Los Angeles, embracing about 33 square leagues. This concession is not in evidence, and we are only made acquainted with its character by references to it in other documents of admitted genuineness before us. It gave to Nieto permission to occupy the land, but from what subsequently took place it is evident that it did not purport to pass the title to him, although in proceedings before the land commission it is often spoken of as a grant, vesting the fee or ownership in him. Under the concession Nieto entered upon the land, and continued in its occupation until his death, in 1804. It would also seem from these documents that Nieto left surviving him four children,— Jose Antonio, Juan Jose, Manuela, and Antonio Maria,—who continued in possession of the land after his death; and that in 1832 two of these, Jose Antonio and Antonio Maria, died, leaving widows surviving them. In the following year, (1833,) on the 26th day of July, one Luciano Grijalva, representing the interests of Juan Jose Nieto, presented a petition to Jose Figueroa, then superior political chief of the territory of Upper California, in which he recited the concession of Governor Pedro Fages to Manuel Nieto, the latter's possession of the land, his death, and the subsequent uninterrupted occupation by his heirs, and prayed, in order that they might enjoy the favor conceded to their father, that separate titles be given to each of them for the several parts corresponding with those designated on an accompanying map, as follows: The tract of Santa Gertrudes to Dona Josefa Cota and her children, as widow of the deceased Antonia Maria Nieto; the tract of Las Bolsas to Dona Catarina Ruiz and her children, as the widow of the deceased Jose Antonio Nieto; the tract of Los Cerritos to Dona Manuela Nieto; and the remainder, which comprehended the tracts Los Coyotes, Alamitos, and Palo Alto, to Don Juan Jose Nieto, who, as head of the family, had determined upon this division for the benefit of its members. To avoid all ground of dis-

pute he asked that possession be given to each one of his or her portion thus designated. On the subsequent day, July 27, 1833, the political chief made a decree reciting the former concession by Governor Pedro Fages to Manuel Nieto, and the peaceable and uninterrupted possession by which he and his heirs had enjoyed the fruits of the lands, and declared them (the parties for whose benefit the petition was presented) owners in fee of the premises, designating the portion granted to each, namely: To Juan Jose Nieto the tracts called "Los Coyotes," "Alamitos," and "Palo Verde;" to Dona Manuela Nieto the tract called "Los Cerritos;" to Dona Josefa Cota, widow of Don Antonio Maria Nieto, the tract called "Santa Gertrudes;" to Dona Catarina Ruiz, the widow of Don Jose Antonio Nieto, the tract called "Las Bolsas." The governor also directed that titles for these several tracts should be issued to the parties, in order that juridical possession might be given to them. On the 22d of May, 1834, pursuant to this decree, formal grants were issued by him to the parties, to each one for his or her separate portion, and among them one to Dona Catarina Ruiz for the tract "known by the name of 'Las Bolsas,' bounded by the tracts of Los Alamitos and Los Coyotes, the river Santa Ana, and the coast;" he declaring, by virtue of the authority conferred upon him by the decree of the previous year, and in the name of the Mexican nation, "the ownership in fee" of the tract to be vested in her, and that she might be put in peaceable possession thereof. The fourth condition attached to the grant stated the land to be seven square leagues in extent, as shown on an accompanying map, and directed the judicial officer who should give the grantee possession to cause it to be measured, so as to point out its boundaries, the surplus to remain to the nation. In March, 1835, juridical possession of the land was given to her, after citation to the neighboring proprietors to be present at the proceeding; that is to say, the possession of the land was officially delivered to her, under the direction of a magistrate of the vicinage. A copy of the record of this proceeding is before us, and it shows that all the formalities required by the laws of Mexico were fully complied with. The proceeding involved a measurement of the land, the marking of its boundaries, and the putting of the grantee in possession. To the record a map of the land was attached.

As stated above, the plaintiff deraigned his title through two patents of the United States, each being for an undivided half of the tract known as "Las Bolsas." The first patent, bearing date on the 19th of June, 1874, was issued upon a final decree confirming the claim of Ramon Yorba and others, founded upon the grant of the Mexican government to Catarina Ruiz, issued, as mentioned above, on the 22d day of May, 1834. Their petition was presented to the land commission on the 20th of October, 1852. It traced the title of the claimants to Manuel Nieto, who, as averred, died in 1804 or 1805, "seised in fee as owner" of the tract of land situated in the county of Los Angeles, "bounded by the river San Gabriel, by the old road to Santa Ana, by the river Santa Ana, and by the coast;" that Nieto acquired his title to the land by grant from Governor Pedro Fages some time between the years 1784 and 1785,

which it was believed was subsequently ratified by the viceroy of New Spain; that four children survived him, who succeeded to his title and possession, and that after the death of two of them the land was divided by Governor Figueroa between the surviving sons and the widows of the deceased sons, and to them separate titles were issued for their respective portions; that to Catarina Ruiz the grant was issued for the tract called "Las Bolsas," and under her the claimants derived their title. It seems from the language of the petition that the claimants treated the concession to Nieto as a grant of title,—an instrument transferring the ownership of the lands to him; but, as already stated, the concession to him did not reach the title, and was only a permission to graze his cattle upon the tract mentioned. It may be doubted whether the political chief of the territory under the Spanish crown possessed any power to alienate the fee of any portion of the public domain. On this subject the land commission, which had occasion to examine the question when the title claimed under the concession to Manuel Nieto was before it, uses this language:

"The concessions under the Spanish authority, made in the Californias before the independence of Mexico, do not purport to be perfect titles; at least none of that character have fallen under the notice of the commission. One only has received confirmation, and that on the ground that an equitable, though not legal, title was established. The old grants were generally mere rights of possession or provisional, and, in almost every case, when the government was established after the Mexican revolution, the parties applied for new grants, which they received, not as a mere evidence of a former subsisting title, but in the form, and under the terms, and subject to the conditions, imposed by the law of 1824 and the regulations of 1828. Under these, the power of the governors over the public domain was defined. It was a power to grant under certain conditions, not a power to recognize and give new evidence of private titles already existing, without conditions or limitations. He had entire discretion as to choice of grantees, and this power enabled him to do most ample justice to persons who held under provisional grants previously issued, or who occupied without a shadow of title or right to the possession. All these presented themselves to the new authorities for concessions under the new order of things, and readily received grants for the ancient possession. The archives of this commission are full of such documents, and the custom was all but universal." Record in *U. S.* v. *Conception Nieto*, from land commission, in clerk's office of U. S. district court, No. 423.

Certain it is that Governor Figueroa, when he made the decree ordering grants to the heirs of Nieto on the 27th of July, 1833, and when he signed the formal grants to them on the 22d of May, 1834, did not consider that the concession to Manuel Nieto passed the ownership of the land. Had it done so, he would have had no power to make grants of the land to others, and to subject his grants to possible forfeitures for breach of conditions annexed. His action shows conclusively that he regarded the land as still part of the public domain of Mexico, to be disposed of under its colonization laws. The documentary evidence introduced before the land commission by the claimants, and upon which the decree of confirmation was made, consisted of the grant to Catarina Ruiz on the 22d of May, 1834, the record of the juridical possession given

to her, and instruments transferring her title to them. The claim was confirmed September 22, 1854, to the extent of the undivided three-fourths of the rancho. On appeal to the district court of the United States the decree was modified, and the confirmation limited to an undivided half of the rancho. Subsequently, on the 4th of March, 1858, the government waived its appeal from the decree of the district court, which thereupon became final. The boundaries given in the decree and recited in the patent are as follows:

"The lands of which confirmation is hereby made are one undivided half of the tract called 'Las Bolsas,' situated in the county of Los Angeles, said tract of Las Bolsas being a part of the lands originally granted to Manuel Nieto by Governor Pedro Fages, in or about the year 1784, and which said grant was recognized and confirmed by the decree of date July 27, 1833, made by Governor Jose Figueroa in the petition of Luciano Grijalva, presented on behalf of the heirs of the said Manuel Nieto; and by the grant of date May 22, 1834, issued by said Governor Figueroa to Catarina Ruiz, widow of Jose Antonio Nieto, a son of said Manuel Nieto; reference for the boundaries for the tract of Las Bolsas being had to the said petition of Luciano Grijalva, and to the map accompanying the same, contained in the *expediente* filed in this case, to-wit: On the south, the sea; on the west, the lands called 'Los Alamitos;' on the north, the lands called 'Los Coyotes' and the tract solicited by Don Patricio Ontiveras; and on the east, the Rio de Santa Ana, as the same ran at the date of said petition."

The claim to the other undivided half of the Rancho Las Bolsas was presented to the land commission by Maria Cleofa Nieto Murillo and her husband on the 6th day of November, 1852. It was rejected by the board, because the claimants failed to connect themselves with the grant to Catarina Ruiz, but upon appeal to the district court this decree was reversed, and the undivided half of the land was confirmed to the claimants. The decree recites:

"Reference for boundaries of said tract of the 'Las Bolsas' being had to the said petition of Luciano Grijalva and to the map accompanying the same, contained in the *expediente* filed in this case, to-wit: On the south by the sea, on the west by the land called 'Los Coyotes' and the tract solicited by Don Patricio Ontiveras, and on the east by the river Santa Ana, as the same ran at the date of the petition."

A survey of the land, confirmed by the decree in favor of Ramon Yorba, was made in 1858, under the direction of the United States surveyor general, and on the 16th of April, 1861, was ordered into the United States district court for review, under the act of June 14, 1860. Exceptions were filed to the survey, which affected the boundary on the west side, but did not affect the line along the east, along the river and its old bed, which is the line in dispute in this case. The exceptions to the western line were sustained, but no change was made on the eastern line; and, in accordance with the direction of the district court, a modified survey of the land was made and returned into the court, which was finally approved February 6, 1874. Upon this approved survey the patent to Yorba of the undivided half of the rancho was issued. The rancho, under the confirmation to the Murillos, was again surveyed under the direction of the surveyor general of the United States for Cali-

fornia, in December, 1868, and was approved by him April 3, 1877, and by the commissioner of the general land-office, August 27, 1877, and upon it the patent to them was issued.

It is plain from this brief statement that on the 22d of May, 1834, the title passed from the Mexican government to Catarina Ruiz by the grant of Governor Figueroa, and by the juridical proceedings which followed in 1835 she was placed in possession of the premises granted. Her estate in the lands thus became perfect, subject only to the possibility of its becoming divested by the subsequent refusal of the departmental assembly to give its approval to the grant. The regulations of Mexico of 1828 for the colonization of the territories of the republic provided that grants of land by the governors thereof to families or private persons should not be held to be "definitively valid" without the previous approval of the departmental assembly, to which the documents relating to such grants were to be forwarded. But this provision did not prevent the title from passing by the grant of the governor. As said by the supreme court of the United States in *Hornsby* v. *U. S.*, 10 Wall. 238:

"Such approval was not a condition precedent to the vesting of the title. According to the regulations of 1828 the authority to make grants of land in California was lodged solely with the governor. It was not shared by him with the assembly. That body only possessed the power to approve or disapprove of grants made by him. Until such approval the estate granted was subject to be defeated. With such approval the grant became, as it was termed in the regulations, 'definitively valid;' that is, it ceased to be defeasible, and the estate was no longer liable to be divested, except by proceedings for breach of its other conditions. Besides, it was the duty of the governor, and not of the grantee, to submit to the assembly grants issued by him for their approbation. His neglect in this respect suspended the definitive validity, as it was termed, of the grant; that is, it prolonged the liability of the estate to be defeated by the action of the assembly and of the supreme government thereon, to which the matter was referred in case the approval of the assembly was not obtained; and no other consequence followed. His neglect was not permitted to operate to divest the grantees of the estate already vested in them. In many instances years elapsed before the approval was obtained, although the grantees were in the mean time in the possession and enjoyment of the property, and in many instances no approval was had previous to the conquest."

No action was taken to divest the estate of the grantee under the former government, because her grant was not then approved, and the power of the departmental assembly of course ceased with the cession of the country. When, therefore, jurisdiction passed from Mexico to the United States, Catarina Ruiz was invested with full ownership of the land. She had an absolute title in fee to the entire tract described and measured off in the proceedings giving her official possession of the property. Her interest in one undivided half of the premises having afterwards passed to Yorba and others, and in the other undivided half to the Murillos, and their claims having been presented to and confirmed by the board of land commissioners appointed by the United States to ascertain and settle private land claims in California, and their decrees of confirmation having become final by the dismissals of the appeals

therefrom by the attorney general, and the surveys of the lands confirmed having been approved, all controversy between those claimants and the United States respecting their title to those lands, and the extent and boundaries thereof, was closed. The decrees were conclusive as to the character of the title, not only against the United States, but also against all persons claiming under them by proceedings subsequent; and the patents of the United States issued thereon were a relinquishment of all claims or right in the lands or power over them, if any then existed. Only prior and superior rights of others remained unaffected. Unless, therefore, the defendants can show that by virtue of the concession made to the parties through whom they claim under the former government, or by virtue of the proceedings before the land commission, and of the patents of the United States issued upon its decree, they acquired a right and title to the demanded premises prior and superior to that conferred by the grant of Figueroa to Ruiz on the 22d day of May, 1834, the plaintiff must be adjudged entitled to recover. What, then, was the right or title, if any, acquired by those defendants under the former government? To answer this question we turn to the documents produced by them. The first of these is a petition of one Manuel Rodriguez, dated September 11, 1801, to Arrillaga, then governor of the territory, stating that in view of the repeated petitions through him to that officer in behalf of Lieut. Don Pablo Grijalva for a place upon which to put his stock and build a house and *corral*, and in view of the power by the governor conferred upon him of passing upon the petitions, he had pointed out to Grijalva the place Arroyo de Santiago, lying midway between the Missions San Juan Capistrano and San Gabriel, about nine leagues from each, stating that there was not within a great distance any rancheria of natives, and that neither of the missions claimed any right to it. The petitioner added that, should the governor make the concession desired, Grijalva might put upon the place a great number of cattle which he had in the immediate neighborhood of Manuel Nieto, and concluded with the expression of a hope that the governor would order a title to issue to Grijalva for the possession of the place within certain distances specified. To this petition the governor, on the 19th of October, 1801, replied, stating that Grijalva should apply to him (Rodriguez) for the place, setting forth its actual condition and the extent of land he desired, and that thereupon notice should be given to the adjoining proprietors to ascertain whether any damage would result to them by the concession asked; and that, this being done, and no objection to the concession being made, he could issue a decree setting forth the fact that there was no objection, and order him to be placed in possession, he forwarding everything to the government for its approval and the issue of a title, adding that this was the way this kind of business was done for those to whom royal lands were given, though he did not know whether the government had made any new provision on this subject. Grijalva, accordingly, on the 8th day of December, 1801, made application to Rodriguez for the place Arroyo de Santiago, in order to put his cattle and horses thereon, stating that the place was situated eight leagues from the Mission San Juan Capistrano,

and from nine to ten from the Mission of San Gabriel. He also stated the extent of the land he desired. On the 14th of December following, Rodriguez directed that notice of the application of Grijalva be given to the fathers of the Missions San Juan Capistrano and San Gabriel, and to Manuel Nieto, in order to ascertain whether they would be prejudiced by granting his petition. The priest of the Mission of San Juan Capistrano returned that, so long as the applicant did not go beyond the boundaries of the land he asked, the concession would not prejudice the mission. It does not appear that any response was obtained from the priests of the Mission of San Gabriel, or that any grant was made upon the petition, or that any further action was had upon it.

It appears, however, that in 1809 one Antonio Yorba claimed that he had been a partner with Grijalva, and was interested with him in his application for the place upon which to put stock and build a house. In November of that year he accordingly presented, through his son, a petition to the governor of the territory referring to the petition of Grijalva, and stating that he had heard that Grijalva, who had since died, had not inserted his name in the application, notwithstanding their partnership; that since Grijalva's death he had agreed with one Juan Peralta to live upon the place, and, with one of the sons of the petitioner, take care of the cattle and horses that were upon it, being about 300 head of each kind. In consideration of these facts, and the large family he had, he requested the governor to make a concession of the place of Santiago to him, that the neighbors of Peralta and himself might be profitable to both. This petition the governor forwarded to Lieut. Don Francisco Maria Ruiz, at San Diego, who, on the 20th day of April, 1810, reported that the petition of Grijalva could not be found in the archives of the presidio there, and that he had inquired for it without success of the widow of Grijalva; that she stated that she had heard her deceased husband say he had presented it in his own name; but, notwithstanding, it was her wish that Antonio Yorba, with his children and her nephew, one Pablo Peralta, should remain on the rancho, in order that they might take care of the stock and crops for the support of their families. On this report the governor made an order on the 1st day of July, 1810, in which he stated that there was no objection on his part to the concession solicited, upon the terms expressed by the petitioner, and for that purpose he directed that the commandant of the presidio of San Diego should take the necessary steps to notify the adjoining land-owners to ascertain whether or not the concession would be detrimental to them, and, in case no detriment would result to them, that the petitioner should be placed in possession. No further proceedings appear to have been had upon this application. It is not shown that any notification to the adjoining proprietors was made, or that any information was obtained of their opinion whether such a concession would be detrimental to them or not. So far as the evidence before us discloses, the efforts of the petitioner ended with this report, and no further action upon it was taken by the governor of the territory. It is too plain for argument that no title passed from the governor by virtue of the documents produced. It is true the

petitioner was subsequently in possession of the premises, but he does not produce, nor is there found anywhere in the archives, any documents showing that any authority was given for him to occupy them. But, even if the possession was taken by permission of the governor or other authorities, no inference of a grant of title can be drawn from it. Some formal proceedings were necessary under the Spanish government to pass title to any portion of the public domain out of the crown to the subject. The population at that time in the country was very sparse, and there were vast quantities of vacant land. Where one occupied such land for his cattle, very little complaint was likely to be made touching his authority; but, be that as it may, nothing is shown by the documents conferring even an equitable right upon the petitioner Yorba, or upon Peralta. It is plain, therefore, that neither of those parties, or any parties claiming through them, had any interest in the property in controversy under the former government which would have given them a standing in a court of justice to call in question the right of Catarina Ruiz by her grant of May 22, 1834. Their interest was, at best, only such an equity as arises in favor of parties who had long been in the occupation of public land, with the silent acquiescence of the government, from the possible improvement they may have made upon it. To such parties the government might well have extended a preference in the purchase or donation of the lands when it concluded to dispose of them. But mere possession of any portion of the public domain, under an instrument which did not purport to transfer the property, did not create, under the Spanish law, a title in the possessor which would enable him to hold the property against the crown; nor did such possession, however long continued, create any title against the Mexican government. *Nieto* v. *Carpenter*, 21 Cal. 455, 489. It follows that whatever title the heirs of Yorba and Peralta possessed in the lands in controversy, which passed to the defendants, was acquired by their proceedings before the board of land commissioners, and the patent of the United States issued upon its decree. The petition of the heirs to the board set forth that they claimed in fee-simple the tract of land known by the name of "Santiago," containing about 10 square leagues, by virtue of a concession to their ancestors by Arrillaga, governor of California, bearing date of July 1, 1810. The concession thus alleged was no other than the order of that date upon which we have already commented, and which did not, in itself, convey any interest in the lands solicited, and was not followed by any proceeding which purported to have that effect, even if it were clear that governors of the province under the Spanish crown possessed any authority to alienate portions of the public domain. The board of commissioners treated the document, however, as a grant of the land, or at least as creating, in connection with the possession of their ancestors, an equitable right to it, and accordingly, by its decree of July 10, 1855, confirmed their claim. An appeal to the district court of the United States was, on the 8th day of June, 1857, dismissed, the government suggesting that it did not intend to further prosecute it, and the decree of the board thus became final. The decree did not, however, change the character

.of the title of the claimants; it simply determined that it was valid, and entitled to recognition and perfection by a survey and patent. When the latter was afterwards issued, on the 21st day of December, 1883,. whatever title to the land was in the United States passed to the patentees; but, if no title was then in them, none, of course, passed. That none was in them at that date is clear from what has already been said with respect to the title of the Las Bolsas, claimed under the grant of Catarina Ruiz. The claim of Ramon Yorba and others to an undivided half of that rancho having been finally confirmed, the survey of that land having been made and approved, and a patent for such undivided half having been issued to the claimants on the 19th day of June, 1874, and the claim of the Murillos to the other undivided half also having been finally confirmed, and the same having also been approved, and a patent for that undivided half having been issued to the claimants on the 27th day of August, 1877, there was no interest or title in the premises surveyed and patented remaining in the United States which they could convey by any subsequent patent. However conclusive against the United States, and parties claiming under them by title subsequent, a patent may be, it in no respect impairs the right of a previous patentee to contest the title upon which the subsequent patent has been issued for the same premises. Every patent issued upon a confirmed claim under the act of March 3, 1851, in terms declares that it shall not affect the rights of third parties; that is, those who have a standing to contest the pretensions of the patentee had no patent been issued.

It follows that the question as to the correctness of the survey of the Bolsas tract, approved by the United States district court and by the officers of the land department, which was much discussed by counsel, is of no practical consequence in the case. The patents under which the plaintiff claims, covering the premises in controversy, passed all the title which the United States then possessed therein; and, until those patents are set aside, the subsequent patent under which the defendants claim can pass no title which can be considered in this action. The issues in the case will therefore be found for the plaintiff, and judgment for the possession of the demanded premises entered thereon, with costs.