BERWIND-WHITE COAL MINING CO. v. METROPOLITAN S. S. CO.

AMERICAN TRUST CO. v. SAME. In re ENGLIS.

(Circuit Court, D. Maine. September 18, 1909.)

No. 625.

MARITIME LIENS (§§ 18, 38, 46*)—STATUTORY LIENS FOR CONSTRUCTION—EFFECT UNDER MARITIME LAW—WAIVER—PRIORITY OVER MORTGAGE.

This case relates to a class of liens arising on the steamers Harvard and Yale under the statutes of New Jersey, discussed in 166 Fed. 782, affirmed in 173 Fed. 471, and further discussed in 169 Fed. 491. It differs from the prior cases only with reference to a further discussion of the doctrines of laches, waiver, and estoppel, in view of the special circumstances. It also holds that the rules in favor of maintaining the liens of this class apply to merchandise installed in the steamers while lying in the state of New Jersey, notwithstanding the contract therefor was made in New York and the principal work in preparing the merchandise was done in the latter state.

[Ed., Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 23, 73, 85; Dec. Dig. §§ 18, 38, 46.*

Waiver and extinguishment, see note to The Nebraska, 17 C. C. A. 102.]

In Equity. Consolidated suits by the Berwind-White Coal Mining Company and by the American Trust Company against the Metropolitan Steamship Company. On petition of Charles M. Englis to intervene. Petition allowed.

See, also, 169 Fed. 493.

Robinson, Biddle & Benedict and Verill, Hale & Booth, for intervener.

Alfred H. Strickland, for Berwind-White Coal Mining Co.

William A. Sargent and Avery F. Cushman, for American Trust Co.

Libby, Robinson & Ives, for Metropolitan S. S. Co.

PUTNAM, Circuit Judge. This petition was heard on April 9, 1909. At that time the court found nothing in the record which impressed it with any conviction that, so far as the larger portion of the claim was concerned, the result would be in any way different on this petition from what it was with the Fletcher petition, decided on December 26, 1908 (166 Fed. 782), and affirmed by the Circuit Court of Appeals on August 18, 1909, reported in 173 Fed. 471, as modified by

force of some circumstances in the opinion passed down on the Wanamaker petition, March 10, 1909 (169 Fed. 491). In the Fletcher Case, everything furnished was furnished within the state of New Jersey. In the Wanamaker Case, the contract for all that was furnished was made in the state of New York, but the delivery of the major portion thereof was made in the state of New Jersey. A portion was delivered in the state of New York, where they were contracted for, and as to that we held that there was not enough to bring the case within the statutes of that state. In the present case, the contract was made by correspondence carried on on the part of the petitioner in New York state, and on the part of the Metropolitan Steamship Company at Boston, in the state of Massachusetts. A portion of the work was put aboard the vessels at Chester, in the state of Pennsylvania, where the hulls were constructed. The entire preliminary work was done at the shops of the petitioner at Greenpoint, in the state of New York. Some portion may have been installed while the vessels were in the state of New York, but the great bulk was installed at Hoboken, in New Jersey, where the vessels were being completed, as explained in the Fletcher Case. As the record here fails in the same particular in which the record failed in the Wanamaker Case, with reference to what was installed within the state of New York, the judgment in this case will relate only to what was installed at Hoboken, and, on the principle stated with reference to the Wanamaker petition, it will cover whatever was installed there, wherever else the preliminary work or any part of the work was done. It will be understood, therefore, that the reference to the master, whatever its general terms, will be limited to what was thus installed at Hoboken.

At the hearing in April, the original complainant, namely, the Berwind-White Coal Mining Company, an unsecured creditor, asked leave to file a brief on the question of waiver. All questions of this character were disposed of quite fully both by us and by the Circuit Court of Appeals with reference to the Fletcher petition; but it is now urged that we stated in our opinion in that case that there is no legal evidence that Fletcher knew of the prior mortgage, and that the present record shows that Englis not only knew of the prior mortgage described in our opinion on the Fletcher petition, but also knew that there were to be supplemental mortgages covering the Harvard and Yale specifically, and also that his knowledge did precede his liens. The brief proceeds with much vigor and care to develop this alleged fact of knowledge on the part of Englis, and to press upon the court the essential difference between the two petitions on that account. On the whole, we think we had better review the present propositions carefully, although we think there is an expression in the opinion of the Circuit Court of Appeals which renders the attempt to discriminate of no effect.

We wish, first, to state that no inference is to be drawn, from what we decided with reference to the Fletcher petition, that any amount of knowledge would have affected the conclusion which we then reached. We decided that case on the then existing facts, leaving any case involving different facts to take care of itself. We also observed at the

outset that all the propositions we have received from counsel with reference to either of the petitions before us in regard to the question of waiver, or any cognate question, entirely overlooked the fact that the conclusions of this court, as well as of the Circuit Court of Appeals, rest on the proposition that the lien given by the statutes of New Jersey is akin to the maritime lien, and has the same characteristics, except it cannot be enforced in admiralty. In this respect it is widely distinguished from the ordinary lien given by the common law or by statutes. The pith of the distinction, and the reason therefor, is found in the following expression appearing in the opinion of the Circuit Court of Appeals with reference to the Fletcher petition, namely:

"By the maritime law, on the other hand, a lien existed for the supply and repair of a vessel having an application more extended. It was not possessory. Indeed, the maritime lien was deemed to be given in order that the vessel might go on its way unembarrassed by the lienor's attempt to obtain immediate payment."

Therefore it is that, with reference to expedition in enforcing the lien, there is a wide difference in favor of the maritime lien, and, consequently, of the liens set out by the petitions for the interveners, which it is now decided, so far as we are concerned, are akin to maritime liens, as we have said. Consequently it was that we decided on the Fletcher petition, as pointed out on pages 791 and 792 of 166 Fed., where we fully stated the facts, that there was no basis for a claim of laches with regard thereto. So far as mere laches is concerned, what we have said there applies to the case here. For any one who wishes to read examples of the extent to which the doctrine of laches fails to apply as against maritime liens, we refer them to 2 Parsons on Shipping and Admiralty (1869) 361 et seq.

Another proposition must be considered with reference to the distinguishing features of maritime liens, and, therefore, the liens in this case; and that is that they are not prejudiced by existing incumbrances, although the incumbrances are known to the lienor, unless in an extreme case like that of a tort-feasor. This is on the broad principle that whoever voluntarily takes a lien on a vessel gives the owner of the vessel implied authority to incumber her for supplies and repairs, so far as the maritime law is concerned. At any rate, so far as that law is concerned, the lien cuts through all incumbrances in the way of mortgages, even though known to the lienor. For the reasons stated, the same rule applies here.

For the reasons we have given in our opinion with reference to the Fletcher petition, it is useless to maintain that the original mortgage of 1905, before the steamers Yale and Harvard were constructed, or their construction commenced, raised any equity as against the interveners. That was fully disposed of in that opinion, and no claim of that nature is made now. Therefore the issue, if at all, is between the lienors and the mortgages on the Yale and the Harvard, one of which was made May 25, 1907, and the other one August 14, 1907. In the present case, one contract was made with the petitioner with reference to the construction work for both vessels. This was made in August, 1905, a complete, binding contract, though in the form of letters. The record does not show when the work of preparation was

commenced by the petitioner, but a very considerable installation on both vessels was commenced at Chester in September, 1906; and, during the whole intervening period, the work of preparation was proceeding at Greenpoint; and the installation at Hoboken, which was by far the principal part of what was accomplished, began immediately after the arrivals of the two vessels there, which, on the part of the Yale, was December 15, 1906, and, on the part of the Harvard, February 25 or 26, 1907. Therefore, under the well-settled equitable rules which must apply here, as also would apply in admiralty, this contract, though executory, so far as we are concerned, until the work of installation was commenced at Hoboken in December, 1906, and February, 1907, was effective from that time to fix the equities of the parties; and that time was several months before the mortgages were made on the Yale and the Harvard, so the petitioner's relief for the whole work done must, in view of the fact of the date of the contract and the beginning of the installations in December and February preceding the mortgages, take full effect as of those months. Therefore the expression found in the opinion of the Circuit Court of Appeals in the Fletcher Case, relating to this topic, must be taken to dispose of every new question raised here. That expression is as follows:

"The Trust Company alleged knowledge by the Fletcher Company of the Trust Company's rights; but the knowledge, if there was any, did not precede the lien."

Thus apparently the Circuit Court of Appeals disposes of both aspects; the one bearing on the Fletcher petition, where we found there was no sufficient proof of knowledge of the mortgages, and the other applying to this case, on the hypothesis maintained in the brief which we are considering.

So much for laches. The parties answering these petitions run together the defenses of laches, waiver, and estoppel. Of course, these defenses are in a certain sense akin to each other, and run into each other; yet they are distinct defenses, and should have been distinctly discussed with reference to the particular evidence bearing on each. Laches, it is true, with some supporting circumstances, may run into waiver, and likewise into estoppel; but each has its own individuality, which should be followed out. This has not been done. Laches need not ordinarily be pleaded, but waiver and estoppel should be. The answer in this case pleads laches and estoppel, but not waiver. However, we will consider them all.

The defense of laches we have disposed of. Waiver may run into estoppel, especially when the alleged waiver grows out of matters of record which are inconsistent with each other. There the law refuses to permit the inconsistent positions, independently of the intention of the parties involved; but in this case waiver must be a matter of intention, and can be nothing else. Of course, intention may be inferred from circumstances; but, in view of the fact, which we have shown, that a lien of the character here alleged is not inconsistent with other incumbrances, and may cut through all of them, there is no such proof here as would justify us in finding that Englis intended to waive,

without consideration, so valuable a right as his lien for so large an amount.

Of course, there is no estoppel of record; and, as to estoppel in pais, the rules of law are not at all loose, as the parties respondent to these petitions seem to think. On the other hand, they are very strict. In Henshaw v. Bissell, 18 Wall. 255, 271, 21 L. Ed. 835, the opinion rendered in behalf of the court says:

"There is, therefore, no case for the application of the doctrine of equitable estoppel. For its application, there must be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud."

It is impossible to find in this record any proofs of such a definite character as to meet these conditions. The attempt here to apply the rule of one party lying by and allowing an innocent party to acquire a supposed right to his prejudice fails. To apply that rule it is ordinarily said that the party acquiring the property must be ignorant of the facts, and must rely upon conditions as he supposed them to be, while the party who stands by must ordinarily know the facts, and have reason to believe that the innocent party is misled or mistaken. Neither of these things are proven here. The circumstances and the application of the rule are, of course, very different from a case where one party is purchasing bonds or taking a mortgage, and the other one has no reason to understand that, in the taking of the bonds or the mortgage, he is relying on any particular state of the title. The ordinary illustration relating hereto is that of one purchasing property, who, of course, assumes that he is getting a suitable title. There is not the slightest evidence that the petitioners had not entire faith that the property was ample to pay their liens and the entire amount of the bonds issued on it, or to be issued on it. On the other hand, there is not a particle of evidence to support the proposition that either the mortgagors or the purchasers of bonds had any other view than that which the petitioners might have entertained. The entire evidence is that Englis understood that the vessels would be mortgaged to pay the cost of construction, and dealt in some of the bonds, both receiving them and disposing of them. The only natural conclusion is that, as he was dealing in the bonds both ways, he believed them to be good notwithstanding all the facts known by him; so that, therefore, it is probable that he was not embarrassed with any notion that the interests of other parties required any disclosure from him. Taking the case by and large, all the evidence upon all these branches of defense is too shifty and loose to support either of them.

There must be a master to report the amount to be allowed for whatever was installed at Hoboken, as we have described.

Let there be a decree sustaining the petition to the extent shown by the opinion passed down on September 18, 1909, establishing the liens according to that opinion, on surrender of any promissory notes received by the petitioner, and directing the master accordingly; and let the decree provide that certified copies thereof and of such opinion constitute the master's commission.