## CONTINENTAL COAL CO. v. BIRDSALL.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1901.)

### No. 402.

**1. Shipping—Construction of Charter—Custom of Port.**

A custom or usage of the port in which a charter was made may be shown in evidence in a suit to determine the rights of the parties under such charter, where it is silent on the subject to which the custom relates, in order to place the court in the position of the parties when the charter was made; but, to entitle such custom to be read into the charter, there must be no room to doubt its existence, and it must be reasonable, certain, consistent with the contract, and not contrary to law, and so general and long established that the parties are conclusively presumed to have contracted with reference to it.

**2. Same—Evidence of Custom.**

A charter, which by its terms required the charterer to "provide and furnish the vessel a full and complete cargo of coal," cannot be held to exempt him from such requirement on account of a strike among coal miners, merely upon the testimony of coal operators that such was the custom of the port where no provision to the contrary was made in the charter, when no one of the witnesses ever knew of a case in which a charterer had been so relieved, and as against the testimony of other witnesses of longer experience that no such custom existed.

Appeal from District Court of the United States for the District of Maryland.

The schooner John B. Manning, of 1,130 tons burden, was chartered to the Continental Coal Company, February 17, 1900, to carry a cargo of coal from Baltimore to one of several Eastern ports, at the option of the charterer, who contracted to "provide and furnish to the said vessel a full and complete cargo of coal," and to pay freight at the rate of two dollars per ton

to Boston or Portland, and more or less to other ports named. At the date of the said charter the Manning was bound to Boston with a cargo, and when discharged she was to proceed to Baltimore to enter on this charter, six days being allowed for loading, Sundays and legal holidays excepted, the vessel to get demurrage at the rate of 6 cents per ton per day if longer detained. The schooner sailed from Boston on March 15th, and arrived at Baltimore on March 29th, reporting the same day to the charterer that she was ready for cargo. On March 21, 1900, while the schooner was on the voyage from Boston to Baltimore, the charterer sent a letter to Jones & Co., brokers for the schooner, that in consequence of a strike then prevailing at its mines they would be unable to load the schooner, and suggested that these agents should recharter her. This notice was communicated to the managing owner of the vessel, and, on March 27th, Jones & Co. notified the charterer that it would be held to its contract, and that, as the vessel was then nearing Baltimore, the captain, on his arrival, would report to it for cargo. The schooner arrived at Baltimore on March 29th, and on the same day reported to the charterer that she was ready for cargo. It declined to load her, giving as a reason that there was a strike at its mines. The schooner was rechartered on April 7th to S. M. Hamilton & Co., for Boston, at 90 cents per ton, and took on board 1,687 tons, with which she sailed on April 14th. The libel was filed for the difference in freight and nine days' demurrage. The court gave a decree for the former, namely, $1.10 per ton for 1,687 tons, amounting to $1,855.70, but did not allow demurrage, and from this decree the Continental Coal Company appealed.

The main question in the case is whether the existence of a strike relieved the charterer from its contract to load the vessel. The charter is silent on the subject, the contract in the charter party being absolute and unqualified to furnish a full and complete cargo. The contention of the appellant is that, by the custom of the port of Baltimore, strikes at coal mines, preventing the charterer providing cargoes as stipulated, abrogated the charter party, in the absence of special provisions therein with reference thereto, and that libelant failed to exercise reasonable diligence to obtain other cargo after notification of the strike. In support of this defense, the president of the appellant company testified that he had been president for three years, "and that he had always understood it was an established, recognized, and universal custom that strikes relieved from charter parties, although not provided against in the charter party." The secretary of the company testified to the same effect. Two witnesses whose business for three years was dealing in and shipping coal, one witness, who had been the treasurer of a coal company for five or six years, and one witness who had been connected with the like business for twelve years, testified to like effect. None of these witnesses had ever known of a single instance in which the charterer had been relieved from his charter by a strike at his mines when there was no provision in the charter party to that effect. The witness whose experience had covered twelve years testified that in one case about twelve years ago the question was made, and that there was a compromise, but he did not know whether there was a provision in the charter party relieving in cases of strikes. The letter heads of the Continental Coal Company contain these words in conspicuous red type: "All agreements contingent upon strikes, accident, or other causes beyond our control." There was no proof that these letter heads had been used in any correspondence with the owner or agent of the schooner prior to the date of the charter party.

In reply to this testimony, the libelant produces three witnesses, one of whom had been in the ship brokerage business for 29 years, and one for 25 years, who testified that their business was principally in the coasting trade, and that they were familiar with the customs prevailing in that port, and that there was no custom in such trade that a strike at the mines of the charterers relieved from the loading of the vessel where the charter party was in writing and silent on the subject, and that they had never heard of an instance at that port where the charterer had been relieved under such circumstances. The other witness for the libelant was connected with the firm of Jones & Co., ship brokers. He had signed the charter for the schooner, and testified that he was familiar with the customs prevailing with

the coasting trade in Baltimore, and that there was no custom, as was claimed by the charterer. He also testified that there had been no correspondence between the charterer and his firm with reference to this charter, and that he had never had any correspondence with the charterer before this charter was made. The same witness testified: That on March 27th a bark was chartered to load coal for Portland at $1.10 per ton; a schooner was chartered on March 21st for Fall River at $1.15; a schooner on March 26th for Boston at $1.20 per ton; a schooner on March 30th for Boston at $1.10; a schooner April 10th for Boston at $1.10. That these were all small vessels and suited the orders which the merchants had at the time. That on April 6th a schooner of 1,720 tons was chartered for Boston at 90 cents per ton; on April 11th a schooner of 1,250 tons for Boston at 80 cents per ton; and on April 16th a schooner of 1,438 tons for Boston at 80 cents per ton. He also testified that the agents of the schooner had made no efforts to recharter the vessel until after her arrival in Baltimore, on March 29th, and after they had notified the charterer of the schooner's readiness for cargo, and that they began their efforts to secure such recharter on March 31st; that the master thereupon gave notice to the charterer that they would proceed to do so as soon as possible, without prejudice to the rights of the owners, under the charter party of February 17th.

Henry W. Williams (Williams, Thomas & Williams, on the brief), for appellant.

Robert H. Smith, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge, after stating the case as above, delivered the opinion of the court.

The appellant having agreed in the charter party "to provide and furnish the vessel a full and complete cargo of coal," and this contract being unqualified, and being expressed in plain language, the testimony offered has been objected to on the ground that there is no uncertainty in the meaning of the language used, and that the terms of the written contract cannot be varied or changed by parol evidence. The grounds upon which testimony as to usage is admissible in a case of this kind is that such evidence is necessary to place the court in the situation in which the parties were when they contracted, and thus enable it to understand the meaning of their language. Whether such usage be called a "custom," or by any other name, if it is one of the circumstances surrounding the parties to the transaction, and was presumably in their minds when the contract was written, then, in contemplation of the law, such usage is written into the contract. But to have that effect there must be no room to doubt the existence of such a custom, and it must be reasonable, certain, consistent with the contract, uniformly acquiesced in, and not contrary to law.

The existence of such a custom as would control the charter party —that is to say, that would be tacitly incorporated in it on the ground that the parties must be presumed to have contracted with reference to it, and to have had it in mind when making the contract, and for that reason be required to conform to it—must be so ancient, uniform, notorious, and reasonable that all parties doing business of this kind at the port of Baltimore are conclusively presumed to have been acquainted with it, and impliedly annex it to

the language and terms of any contract made which is to be performed at that port. Any usage of such doubtful authority as to be known only to a few has not this character. The witnesses for the appellant have entirely failed to prove facts essential to make out a custom, in the sense of the law. They are all dealers in coal, and all testify, in substance, that it was the custom at the port of Baltimore that strikes at the mines relieved the charterers, yet none of them knew of a single instance where a charterer had been so relieved. This amounts to nothing more than a self-serving opinion of parties engaged in the coal business that they have certain rights, with no evidence that such right has ever been acknowledged or acquiesced in; while the witnesses for the libelant, of much longer and larger experience and greater opportunities of knowledge respecting charter parties, testify that there is no such usage or custom. It is incredible that a uniform, long-established, notorious usage, such as those who make shipments from that port are presumed to have knowledge of, and therefore to be bound by, should exist, if such witnesses as the libelant produced were ignorant of it, and it is only such notorious, reasonable, and well-defined custom that the courts can presume to have been in the minds of the contracting parties, and therefore to prevail over the express words of the contract. Scrutton, Charter Parties, 16; Bliven v. Screw Co., 23 How. 431, 16 L. Ed. 510; The Harbinger (D. C.) 50 Fed. 941, 943.

The only other point in the case is that made in the sixth and seventh assignments of error, which rest upon the doctrine of the duty of the party to a contract to mitigate, by reasonable diligence, the loss necessarily resulting from the breach. Assuming that this is a case where such a duty was imposed, we are of opinion that the facts proved do not show any fault in the libelant. The owners of the vessel were not in Baltimore, and before undertaking to make a new charter they were entitled to know the entire situation, and it appears that shortly after the arrival of the schooner, when the charterer refused to provide a cargo, the agents of the vessel did, without unreasonable delay, make all proper efforts to secure another cargo. There had been a sharp decline in freight rates for coal vessels on account of the strike, and although it is proved that a few small vessels had secured cargoes prior to the 29th March, at somewhat better rates, yet the testimony shows that, about the time this new cargo was arranged for, other vessels of like capacity were chartered at the same or lower rates. Under the conditions then prevailing, a vessel of this tonnage could not probably upon the instant secure a cargo suitable to her capacity. The broker's clerk testified "that this was the best business we could get for the Manning," and the record does not disclose that any better business was offered, or that the defaulting charterer made any effort to assist or procure a cargo upon any better terms, which it might well have done. The judgment of the court below is affirmed.