EL PASO LIVE STOCK COMMISSION CO. v. COLORADO LIVE STOCK
COMMISSION CO.†

(Circuit Court of Appeals, Eighth Circuit. April 27, 1909.)

No. 2,855.

PRINCIPAL AND AGENT (§ 103*)—RIGHTS OF THIRD PERSONS—ACTS DONE IN RE-
LIANCE OF STATEMENTS BY AGENT—IMPLIED AUTHORITY.

Plaintiff sold a herd of 1,300 cattle to a third person, who gave a draft
on defendant, a live stock commission company, for $2,000 to apply on
the purchase price. This draft plaintiff took to a bank and requested the
cashier to telephone defendant and ascertain whether it would pay the
draft. On being told by the cashier that the draft was given for cattle
which had been shipped, defendant agreed to and did pay the draft. Two
days later, having been told by the bank that the draft would be paid,
plaintiff made a partial delivery of the cattle, which were shipped to de-
fendant by the purchaser, who gave another draft on defendant for over
$10,000 in full payment therefor. Defendant received the cattle, but, on
being advised of the second draft, refused to pay it or to surrender the
cattle on demand to plaintiff without repayment of the $2,000. Defend-
ant had no knowledge of the actual transaction, but supposed the draft to
have been given in whole or part payment for cattle which had been
shipped to it; nor had it any such relations with the purchaser as would
authorize him to make the drafts. Held, that plaintiff was bound by the
statements made by the bank as its agent, and chargeable with knowledge
that defendant accepted and paid the first draft on such statements, and
in reliance on the supposed shipment to it of the cattle, to which it had
the right to look for security and repayment, and that the plaintiff was
not entitled to recover the cattle without repayment of the amount of
such draft.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 103.*]

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District
of Colorado.

John H. Knaebel, for plaintiff in error.

L. F. Twitchell (Frank C. Goudy, on the brief), for defendant in
error.

Before SANBORN and ADAMS, Circuit Judges, and RINER,
District Judge.

RINER, District Judge. This was an action in replevin. The par-
ties were arranged in the Circuit Court as they are arranged here,
the plaintiff in error being the plaintiff and the defendant in error be-
ing the defendant, and will be hereafter referred to as plaintiff and
defendant, respectively.

The record shows that on the 17th of September, 1906, the plaintiff
had about 1,300 head of Mexican cattle in a pasture, known as the
"Hall pasture," near Fountain, Colo.; that on that day A. G. Put-
nam purchased these cattle from Charles F. Hunt, president of the
plaintiff company, agreeing by an oral agreement to pay therefor the
sum of $13.75 per head, excluding the calves, which were to be de-
livered with the other cattle without additional charge therefor. The

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
†Rehearing denied July 12, 1909.

negotiations for the sale and purchase of these cattle were carried on at the Pike's Peak Club in the city of Colorado Springs, and, after an agreement had been reached between the parties as to price per head to be paid for the cattle, conditions of delivery, and time of delivery, Putnam gave Hunt a draft on the defendant company for $2,000 to apply upon the purchase price of the cattle. The negotiations were completed, as the record shows, about 12 o'clock noon on the 17th day of September, and that, immediately upon its receipt from Putnam, Hunt took the draft to the Exchange National Bank of Colorado Springs and asked the bank to telephone the drawee, the defendant, and inquire if the draft would be honored.

Hunt testified:

"Q. About what hour of the day of the $2,000 draft was it handed to you by Mr. Putnam? A. I think it was about 12 o'clock; we went over to lunch together; I think it was about 12 o'clock at noon. Q. Where were the cattle at that time? A. Running at large in the pasture. Q. Did you take that draft as a matter of course, without inquiry, or did you inquire about it? A. I immediately went to the bank. Q. What bank? A. The Exchange National Bank of Colorado Springs, and deposited it to the credit of my company. I asked them to telephone the drawee, the Colorado Live Stock Commission Company, if he would honor the draft, and the bank cashier reported to me that they had—"

At this point objection was made, and the witness then said:

"They reported favorably; the draft was paid."

On cross-examination, he testified:

"Q. You say the trade was finally consummated at the Pike's Peak Club? A. Yes, sir, on the 17th. Q. And by that trade he was going to take all of your cattle? A. That was the trade. Q. He gave you, then, a payment of $2,000 by this draft? A. Yes, sir. Q. That $2,000 was to apply upon the purchase price of the cattle? A. Yes, sir. Q. That was on the 17th? A. Yes, sir, the 17th. Q. And that same afternoon, was it, that you deposited the draft—or the next day? A. The same day before I went to lunch. I walked down to the bank and had them telephone, and made the deposit. Q. That was in the Exchange National Bank? A. The Exchange National Bank; yes, sir. Q. You stated that you requested them, at the time of depositing it, to telephone to the Colorado Live Stock Commission Company, upon whom it was drawn? A. I did. Q. Did they telephone before they entered it as a credit upon your book? A. They did not. Q. Do you know which one telephoned? A. I don't know which telephoned; the cashier is the gentleman with whom I talked. Q. How long after that before they reported to you that they had telephoned with reference to the draft? A. I think it was that evening, if not the next morning before I returned to the pasture."

And after being cross-examined as to some other matters, he was again asked on cross-examination:

"Q. Referring for a moment to the telephone conversation by the cashier or employé of the Exchange Bank at the time this $2,000 draft was given, will you state just what you told him to telephone? A. I can state it as I remember it? Q. Yes. A. The import of it was that I asked him to telephone the Colorado Live Stock Commission Company if they would honor this draft—Mr. Putnam's—of $2,000. Q. Was there anything said at the time about its being for cattle? A. Nothing at all. Q. You didn't say anything at that time? A. I did to the bank, yes; I told the bank I had sold my cattle; what they said I don't know. Q. You don't know what they

said at the time? A. No. Q. But did they telephone for you? A. Yes, sir. Q. In regard to this draft? A. They said so."

Elijah Bosserman, president of the defendant company, testified on direct examination:

"Q. I show you Exhibit C, which is a draft for $2,000 on the Colorado Live Stock Commission Company, and drawn in favor of the plaintiff in this case, dated September 17, 1906, signed by A. G. Putnam. When did you first have knowledge of that draft? A. I first had knowledge of that draft through, I suppose it was, the Exchange Bank at Colorado Springs that called me up on the phone. Q. Well, some one did call you up on the phone? A. Yes, sir. Q. Did they state what bank it was? A. I think it was the Exchange Bank; they said, 'This is the Exchange National Bank,' or something to that effect. * * * Q. Did the bank, at the time it telephoned you, say that this draft was drawn by A. G. Putnam, and did they say what it was drawn for? A. Yes, sir. Q. What did they say it was drawn for when they asked you if you would pay it? A. They said it was for the payment of cattle. I asked them if they had made shipment, and they told me, 'Yes.' Q. So when the draft came in it was paid? A. Yes, sir."

And on cross-examination:

"Q. You paid that draft on the faith of the credit of the bank at Colorado Springs, or on the faith of the signature of A. G. Putnam? A. They told me it was for cattle, and I paid it; I told them I would pay it if it was for cattle for immediate shipment, which they told me it was. Q. Who told you that? A. The bank; he said he was cashier of the bank."

The draft was paid on the 19th of September at Denver, and, on the 20th, Putnam drew another draft on the defendant for the sum of $10,615, and on the same day 25 cars of cattle, numbering substantially 843 head, were shipped by Putnam, consigned to the defendant. The cattle arrived at Denver on the morning of the 21st, and on that day the defendant was informed by Putnam that he had drawn a second draft for $10,615. This was the first information received by defendant that any such draft had been drawn. The defendant declined to pay it, and it was protested. Hunt came to Denver, made demand upon defendant for the cattle, which the defendant declined to surrender until the $2,000, the amount of the first draft, which it had paid was returned; this Hunt refused to do and brought this action to recover possession of the cattle.

The sole question, under the facts disclosed by the record, is whether the plaintiff was entitled to the possession of the cattle without refunding the $2,000 paid to the plaintiff by the defendant upon the first draft. It would be interesting indeed to here review the learning upon the rights of consignors, consignees, and factor men and the rules of law applicable to the right of recission between parties to contracts, and to notice at some length the very able discussion of the cases relating to these subjects found in the briefs of counsel, but in the view we have taken of this case it becomes unnecessary to do so. It must be borne in mind that the defendant was not a party, but a stranger, to this contract between Putnam and the plaintiff; that it had no information which would tend in the slightest degree to cause it to suspect that such a contract had been made, or that any draft other than the $2,000 draft was involved in the transaction; or that any other number of cattle, in excess of the number which the

$2,000 would pay for, had been purchased by Putnam from the plaintiff.

Mr. Bosserman testified, in explanation of how he came to honor the $2,000 draft, that he supposed that Mr. Putnam had bought some bulls and cows for substantially that amount. Neither was there anything in the course of dealing between the parties, as disclosed by the record, tending to show that Mr. Putnam or any one else had the right to suppose that any such credit as that represented by the second draft would be extended to him by the defendant. It is true the record shows that on former occasions the defendant had advanced money to Putnam to purchase cattle, in small amounts, never to exceed two or three thousand dollars, and then always upon cattle for immediate delivery and when he had made arrangements beforehand for the credit. When the 843 head of cattle were received, in view of the assurances given by the bank at the time the draft for $2,000 was paid, that the cattle were for immediate delivery, the former course of dealing between Putnam and the defendant, and from the fact that it had no intimation that any other draft had been drawn, Mr. Bosserman might well have thought that the only interest the defendant had in the cattle was in the number purchased by the money advanced by defendant, and that Mr. Putnam had made other arrangements for the balance.

We think it clearly appears from the record that, if the defendant had been fully informed of the entire transaction, it would have declined to honor the first draft for $2,000. It was not so informed, but was led to believe that the $2,000 was to be applied in payment for cattle to be immediately shipped. It is true that Mr. Hunt said that he did not expressly authorize the bank to assure the defendant that the money was to be applied in payment for cattle to be immediately shipped. His testimony upon that question, when called in rebuttal, was:

"Q. Did you ever send any message to the defendant, or authorize any bank, or individual, to send any message to the effect that the $2,000 draft was drawn against any shipment of cattle? A. I never did, sir, in regard to that."

. And on cross-examination, while on the stand in rebuttal, he testified:

"Q. You testified this morning, didn't you, that you told the bank to call up Mr. Bosserman and see about the $2,000 draft? A. Yes, sir. Q. And see whether it would be paid? A. Yes, sir. Q. I believe you also testified that you had told the bank that you had sold the cattle? A. Yes, sir, that I had sold my herd."

He did, however, authorize the cashier of the bank to make the inquiry, and the record shows that he proceeded no further toward carrying out the contract until he received a report from the bank, and he nowhere tells us what that report was, except, in a general way, that it was favorable, and although called in rebuttal, after Mr. Bosserman had testified as to the condition upon which the draft would be paid, he does not say that the bank did not communicate that fact, and all that Mr. Bosserman said upon the subject to him.

No principle is better settled than, as said in Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618:

"That he, who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted."

This doctrine, while it originated in courts of equity, has often been applied to cases arising in courts of law. Dickerson v. Colgrove, 100 U. S. 580, 25 L. Ed. 618; Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79.

If Hunt had himself telephoned to the defendant instead of asking the bank to do it, and received the answer which the bank received and gave the assurance which the bank gave, there could be no doubt, we take it, in the mind of any one, but that he would be estopped from denying that the money was to be applied in payment for cattle for immediate shipment, to the amount of the draft, and that the defendant had the right to be reimbursed out of the proceeds of the sale of the cattle shipped to it. Did the fact that he authorized the bank to communicate with the defendant instead of doing it himself change his position or release him from the obligation to refund this money? We think not. He handed the draft to the cashier of the Exchange National Bank, informed him that he had sold his cattle, and authorized the cashier to ascertain whether or not the draft would be paid, and did not move further in the matter until he received the report of the cashier. We think it is safe to assume, in the absence of any denial by him, and from the knowledge common to every one as to the manner in which banks conduct their business to avoid personal liability, that the report of the cashier advised him fully of the condition upon which the draft would be paid.

It has been often decided:

"That, where one holds another out to the world as his agent, in determining the liability of the principal the question is not what authority was intended to be given to the agent, but what authority was a third person dealing with him justified, from the acts of the principal, in believing was given to him." Griggs v. Seldon, 58 Vt. 561, 5 Atl. 504; Walsh v. Hartford F. Ins. Co., 73 N. Y. 5; Dodge v. McDonnell, 14 Wis. 553; Webster v. Wray, 17 Neb. 579, 24 N. W. 207; Columbia Mill Co. v. National Bank of Commerce, 52 Minn. 224, 53 N. W. 1061; Lister v. Allen, 31 Md. 543, 100 Am. Dec. 78.; Carmichael v. Buck, 10 Rich. (S. C.) 333, 70 Am. Dec. 226; Howell v. Graff, 25 Neb. 130, 41 N. W. 142; Milne v. Klen, 44 N. J. Eq. 378, 14 Atl. 646; Stovall v. Com., 84 Va. 246, 4 S. E. 379; Routh v. Agricultural Bank of Mississippi, 12 Smed. & M. (Miss.) 161.

The only interest the defendant had in the cattle was either in separate cattle amounting in value to $2,000, or in the total number shipped to the extent of its special interest of $2,000, and we do not think it can be said that it was obliged to separate the cattle when the cattle were all demanded by the plaintiff before the replevin suit was brought, because it was not known by the defendant in what way the cattle had come, and the distinct understanding with the plaintiff was that the draft for $2,000 was paid on condition that the cattle would be shipped immediately for its protection in the payment of it. We say "the distinct understanding with the plaintiff," because the plaintiff authorized the cashier of the bank to speak for him and in-

quire about the draft before he entered upon a delivery of the cattle, and, when the inquiry was made, it was made in pursuance of the authorization of Hunt; when the answer came, it was in pursuance of the inquiry, and it must be held, therefore, that all were fully authorized.

The judgment of the Circuit Court is affirmed.

SANBORN, Circuit Judge (dissenting). Among the terms of the agreement of sale of the cattle were these, that they should be shipped in two lots, 25 car loads in the first lot and the remainder in the second lot, that each lot should be paid for in full upon its delivery, and that the draft for $2,000 should be applied in part payment of the second lot. It was upon this contract that the draft for $2,000 on the defendant was given to the plaintiff on the purchase of Putnam on September 17, 1906. Under this agreement on September 19, 1906, the plaintiff took the draft for $10,615, drawn by the purchaser, Putnam, in payment for the 25 car loads which upon that day were shipped by direction of Putnam to the defendant. This draft in payment for the cattle was not paid, and the title and the right to the possession of these cattle remained in the vendor. Where the agreement of sale is that the property shall be paid for on delivery, and the purchaser gives a check or draft at the time of delivery, pursuant to the agreement which is not paid, the sale is on condition that the vendor retains the right of possession, and that he may replevy the property as soon as the check or draft is dishonored. Matthews v. Cowan, 59 Ill. 341, 347; Sprague Canning Co. v. Fuller, 86 C. C. A. 46, 49, 158 Fed. 588, 591; Morris v. Rexford, 18 N. Y. 552, 555; Russell v. Minor, 22 Wend. (N. Y.) 659, 664; Paul v. Reed, 52 N. H. 136, 138; 24 Amer. & Eng. Encyclopedia of Law, 1052, 1053, note 1; Wells v. Merle & Heaney Mfg. Co., 66 Ill. App. 292, 295; Ames v. Moir, 130 Ill. 582, 591, 22 N. E. 535; The Elgee Cotton Cases, 89 U. S. 180, 188, 196, 22 L. Ed. 863. And where a part payment has been made and delivery follows, but the check or note for the remainder of the payment is dishonored, the right of possession still remains in the vendor, and replevin will lie until the property is paid for in full. Baker v. McDonald, 74 Neb. 595, 104 N. W. 923, 1 L. R. A. (N. S.) 474.

When the cattle arrived and were tendered to the defendant, it knew that they were purchased and delivered upon condition that the draft for $10,615 should be paid. It, however, declined to pay this draft because the cattle were not in its opinion worth so much money, but nevertheless took and held possession of all these cattle worth over $10,000 to secure to itself the repayment of the $2,000 which it had paid upon the first draft. The defendant was not a bona fide purchaser of the cattle from Putnam, the vendee, because it knew the condition of their sale before it received them, and it could not have obtained from him any better title or right of possession than he had, and his title and right of possession were subject to the condition that the plaintiff held both until the $10,615 were paid. Harkness v. Russell, 118 U. S. 667, 681, 7 Sup. Ct. 51, 30 L. Ed. 285; Canadian Bank of Commerce v. McCrea, 106 Ill. 281, 285, 286; Coggill v. Hartford & New Haven R. R. Co., 3 Gray (Mass.) 545, 550.

But it is said that the plaintiff is estopped from asserting its title and from recovering possession of its cattle from the defendant until it repays to the defendant the $2,000 which the latter paid upon the first draft, by reason of the facts that after the agreement of sale had been made and before the delivery of the cattle the plaintiff informed its bank that it had sold its herd of cattle, asked the bank to inquire of the defendant whether or not the vendee's draft upon it for $2,000 would be paid, the bank inquired, the defendant answered that it would pay the draft if it was drawn for cattle for immediate shipment, and the bank, although the plaintiff had never authorized it, or any individual, to state that the draft was drawn against any shipment of cattle or to make any other statement about the sale, told the defendant that the draft was for cattle bought for immediate shipment and that the cattle had been shipped, although they had not been, and the plaintiff had not stated that they had been. Thereupon the defendant paid the draft in reliance upon the statement of the bank that it was drawn for cattle bought for immediate shipment. My mind refuses to assent to the conclusion that these facts raise such an equitable estoppel as deprived the plaintiff of its legal title and right to the possession of its cattle, or that it bound it to repay the $2,000, or that it fastened a lien upon its cattle for that amount.

1. The statement of the plaintiff to the bank that it had sold its herd of cattle and its request that the bank would ask the defendant if Putnam's draft for the $2,000 would be paid gave no actual or apparent authority to the bank to make on behalf of the plaintiff any statement or representation, much less any false statement or representation, which the plaintiff had not communicated to it in relation to the sale of the cattle, and for that reason the plaintiff, it seems to me, was not bound by any statements of the bank. If A. makes a sale of property for $15,000 to B. on condition that B. shall pay for it in full before it is delivered, and B. gives him a draft upon C. for $2,000, and A. tells his bank that he has sold his property, asks it to inquire of C. if the draft for $2,000 will be paid, does that authorize the bank to deprive C. of the entire value of his draft by making statements about A.'s sale of his property which A. never made and never directed the bank to make? It is common practice for payees of drafts on distant drawees to ask their banks to inquire of the drawees whether or not the drafts will be paid, but no authority in the banks to make statements regarding the property of the payees which will deprive them of that property or compel them to repay the money due them on such drafts can in my opinion be lawfully inferred from such requests. A direction to or a request of the bank by the payee to make the controlling statement, it seems to me, would be indispensable to an estoppel of the payee by such a statement.

2. More than a statement or conduct which leads another to do what he would not otherwise have done is indispensable to an equitable estoppel which will destroy the lawful title of the owner to property, although the maintenance of such title may subject another to loss, or injury, or disappointment of expectations upon which he acted. Either a willful intent to deceive, or such gross negligence of the rights of others as is tantamount thereto, is essential to such an estop-

pel. Truthful statements and conduct made with ordinary care will not raise such an estoppel. There must be some moral turpitude or some breach of duty. Henshaw v. Bissell, 18 Wall. 255, 271, 21 L. Ed. 835; Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 335, 336, 23 L. Ed. 927; Steel v. Smelting Co., 106 U. S. 447, 455, 1 Sup. Ct. 389, 27 L. Ed. 226; Bank v. Farwell. 7 C. C. A. 391, 394, 396, 58 Fed. 633, 636, 639; Given v. Times-Republic Printing Co., 52 C. C. A. 40, 43, 114 Fed. 92, 95.

The cases of Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618, and Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79, do not conflict with this rule. In the Dickerson Case Edmund Chauncey and Sarah Kline owned equal undivided parts in a tract of land which Sarah sold and conveyed by warranty deed to Lowell Morton, who went into possession of the property in 1854. Lowell caused his brother Eleazer to write Chauncey and to ask him if he made any claim to the premises. Chauncey in response sent a letter in 1856 to Sarah Kline, his sister, the contents of which were communicated to Lowell Morton, in which he wrote:

"You can tell Mr. Morton for me he need not fear anything from me. Thank God I am well off here, and you can claim all there. This letter will be enough for him."

In reliance upon this letter, Morton conveyed the lands by warranty deeds to others, who improved them. In 1865 Chauncey conveyed his undivided interest to Dickerson and another, and in 1873 Dickerson and another brought ejectment and were held to be estopped by Chauncey's letter. If the plaintiff in this action had written a letter to the bank to the effect that it would claim nothing under the draft for $2,000, or that it would repay to the defendant whatever it paid upon this draft, or that if the defendant would pay the draft it should have a lien upon the plaintiff's cattle for that amount superior to its claim for the purchase price of them, and if the plaintiff had directed the bank to tell the defendant the contents of this letter, this case would be analogous to Dickerson v. Colgrove.

In Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79, a trustee appointed by the court under a creditors' bill against the debtor, Kirk, sold certain of his lands, and the sale was confirmed by the court. Before the trustee made his deed Kirk appeared in the court and objected to the allowance of simple contract debts in the distribution of the proceeds of the sale. But those debts were allowed, and thereafter on December 14, 1865, the trustee conveyed the lands to the purchaser, Hamilton, who paid $4,000 for them and went into possession of them. Kirk resided on an adjoining lot, but he never objected to the sale or claimed that there was any defect therein, or claimed any title to the property until 1872, when he brought ejectment, although he knew that Hamilton was erecting a building upon the lots which cost him $4,000 in the intervening years. The court held these acts constituted a clear fraud, and that he was estopped to recover the property. In each of these cases the plaintiffs were guilty of actual and willful deceit. They owed to the defendants the duty to tell the truth about their claims to the property which the defendants were purchasing and

improving, and they made misrepresentations which deceived the defendants to their injury. They were both guilty of moral turpitude and of breaches of duty. But in the case at bar the plaintiff owed the defendant no duty to disclose the nature of his transaction or the terms of his sale. It was dealing with the defendant at arm's length. It was not asking the defendant to pay the draft for $2,000. It was not the guarantor of the payment of that draft or surety in any sense for the drawee. It was the vendor of its cattle; Putnam was the vendee. Putnam was the drawer of the draft; he was its guarantor, and he it was that was requesting the defendant to pay the $2,000, not on the plaintiff's, but on Putnam's, account. The plaintiff, the vendor, stood on one side and Putnam and the defendant on the other side of this transaction, and to each of the latter the rule caveat emptor was applicable in all its force. The plaintiff's inquiry whether or not the draft would be paid was not a request for its payment, but a mere request for information. It was the owner of its cattle. One of the conditions of its contract of sale was that they should be paid for in full at or before their delivery, and that it should be entitled to their possession until they were paid for in full, and the record discloses no evidence that the defendant ever made any statement or representation inconsistent with the existence of that condition, and hence none that ever could estop it from enforcing the condition. The only statement the evidence shows that it made, that it had sold its herd of cattle, and even the bank's unauthorized statement that the cattle had been bought for immediate shipment and that they had been shipped, were all consistent with the condition of the sale, and the rule of caveat emptor placed on the defendant the burden to ascertain the terms of the sale if it deemed them material.

In Henshaw v. Bissell, 18 Wall. 255, 271, 21 L. Ed. 835, the Supreme Court said:

"There is, therefore, no case for the application of the doctrine of equitable estoppel. For its application there must be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud. An estoppel in pais is sometimes said to be a moral question. Certain it is that to the enforcement of an estoppel of this character, such as will prevent a party from asserting his legal rights to property, there must generally be some degree of turpitude in his conduct which has misled others to their injury."

In Brant v. Virginia Coal &·Iron Company, 93 U. S. 326, 335, 336, 23 L. Ed. 927, the Supreme Court again said:

"It is difficult to see where the doctrine of equitable estoppel comes in here. For the application of that doctrine there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury. 'In all this class of cases,' says Story, 'the doctrine proceeds upon the ground of constructive fraud or of gross negligence, which in effect implies fraud. And, therefore, when the circumstances of the case repel any such inference, although there may be some degree of negligence, yet courts of equity will not grant relief. It has been accordingly laid down by a very learned judge that the cases on this subject go to this result only, that there must be positive fraud or concealment, or negligence so gross as to amount to constructive fraud.' 1 Story's Eq. 391. To the same purport is the language of the adjudged cases. Thus, it is said by the Supreme Court of Pennsylvania that 'the primary ground of

the doctrine is that it would be a fraud in a party to assert what his previous conduct had denied, when on the faith of that denial others have acted. The element of fraud is essential either in the intention of the party estopped, or in the effect of the evidence which he attempts to set up.' Hill v. Eppley, 31 Pa. 334; Henshaw v. Bissell, 18 Wall. 271, 21 L. Ed. 835; Biddle Boggs v. Merced Mining Co., 14 Cal. 368; Davis v. Davis, 26 Cal. 23, 85 Am. Dec. 157; Commonwealth v. Moltz, 10 Pa. 531, 51 Am. Dec. 499; Copeland v. Copeland, 28 Me. 539; Delaplaine v. Hitchcock, 6 Hill (N. Y.) 16; Havwes v. Marchant, 1 Curt. 136, Fed. Cas. No. 6,240; Zuchtmann v. Roberts, 109 Mass. 53, 12 Am. Rep. 663. And it would seem that to the enforcement of an estoppel of this character with respect to the title of property, such as will prevent a party from asserting his legal rights, and the effect of which will be to transfer the enjoyment of the property to another, the intention to deceive and mislead, or negligence so gross as to be culpable, should be clearly established."

If, after the payment of the $2,000 and before the cattle were shipped, the defendant had brought an action for the cattle, it could have recovered neither the cattle nor any lien upon them until it paid the balance of the purchase price, the $10,615, and it acquired no rights by the delivery which was conditioned by the payment of that amount. The plaintiff did nothing inconsistent with this condition, nothing but to tell its bank that it had sold its cattle and to ask it to inquire whether or not the draft for $2,000 would be paid. I am unable to perceive any moral turpitude or any negligence whatever in these acts, or in the fact that the plaintiff subsequently continued to assert its legal rights under its legal contract. In my opinion it was guilty of no moral turpitude and of no breach of duty which should deprive it of the $2,000 which it had the legal right to receive, or of its cattle, which it had the right to hold until the purchase price for them was paid, or of the right to enforce its contract of sale, under which it was entitled to hold both the cattle and the $2,000 until the full purchase price of the former was paid to it, and I think the judgment below should be reversed.