### THE F. J. LUCKENBACH.

### LUCKENBACH v. 500 TONS, MORE OR LESS, OF SCRAP IRON et al.

(District Court, E. D. Pennsylvania. March 16, 1914.)

#### Nos. 51, 56 of 1909.

1. SHIPPING (§§ 110, 113*)—CONSTRUCTION OF CHARTER PARTY.

The determination of what constitutes "right delivery" under a contract of affreightment, and the question as to what the duty of stowage is, where the charter party is silent on the subject, depends in each instance on the character of the cargo to be carried.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 420, 421, 424–439½; Dec. Dig. §§ 110, 113.*]

2. CUSTOMS AND USAGES (§ 15*)—CONSTRUCTION OF CHARTER PARTY—CUSTOM OF THE TRADE.

In the absence of any express provision in a charter party as to the manner of stowage or of delivery of the cargo, the custom of the trade may be shown as one of the circumstances affecting the subject-matter and surrounding the parties when the contract was made and as presumably intended to be a part of it.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 30–33; Dec. Dig. § 15.*]

3. SHIPPING (§ 110*)—CONSTRUCTION OF CHARTER PARTY—MANNER OF STOWING CARGO.

An agent of the owner in Galveston chartered two steamships for the carriage of cargoes of scrap iron from that port to Philadelphia. Scrap iron is of distinct grades and classes, each of which has its own use and price, and when mixed they lose their character and value. The charter parties contained no provision as to the manner of stowage or delivery of the cargo, but before they were signed there was an understanding and agreement between the shipper and the owner's agent that if the cargoes were tendered in separate lots the lots should be stowed and delivered to the consignees separately, and it was stated by the owner's agent that it was the custom of the port of Galveston to so carry and deliver such car-

goes and it was not necessary to provide for it in the charter parties, which representation was true and was relied upon by the shipper. The cargoes were tendered in separate lots according to grade and class with sufficient dunnage for stowing the lots separately, but were in fact mixed on the vessel and so delivered, to the shipper's damage. *Held*, that the custom could be shown to affect the construction of the charter party, and that the owner was bound by it and by the agreement of his agent and was liable for the loss caused the shipper.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 420, 421; Dec. Dig. § 110.*]

In Admiralty. Suits by Joseph Joseph & Bros. Company against the steamship F. J. Luckenbach and by Edgar F. Luckenbach against 500 tons, more or less, of scrap iron, Joseph Joseph & Bros. Company, claimant. Decrees in favor of Joseph Joseph & Bros. Company in each case.

A. S. Weill and L. Stauffer Oliver, both of Philadelphia, Pa., and Julius C. Feder, of New York City, for libelant.

Peter S. Carter, of New York City, and Biddle, Paul & Jayne, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. In suit No. 51, Joseph Joseph & Bros. Company filed a libel and subsequently an amended libel against the steamship F. J. Luckenbach, claiming damages to the amount of $4,355 arising from the alleged improper loading, stowage, and discharge of a cargo of scrap iron carried by the steamship from Galveston, Tex., to Philadelphia, Pa., under a charter party dated July 29, 1909, between the owner of the steamship and the Phœnix Iron & Steel Company and consigned to the libelant. The libel alleges that on September 27, 1909, the master of the Luckenbach at Galveston, the loading then having been completed, issued three bills of lading to the Phœnix Iron & Steel Company for the scrap iron, one of which was indorsed for delivery to the order of Jos. Joseph & Bros. Company, the libelant; that the scrap iron was delivered to the steamship in good order and condition in separate lots according to the grades and classification which were set out in the bills of lading. It is further alleged that, before and at the time of the execution of the charter party, the agents for Edgar F. Luckenbach, owner of the steamship, in order to induce the Phœnix Iron & Steel Company to sign the charter party, represented, promised, and agreed that, under the charter party as executed, the iron would be loaded, stowed, carried, and delivered by the steamship in separate lots, and that, in consequence of the said representations, promises, and agreements, the Phœnix Iron & Steel Company was induced to and did sign the charter party. The libelant claims damages caused by alleged negligent and improper stowage by the steamship, so that there was an indiscriminate mixture of the lots and classes of scrap iron, and by the discharge of the cargo in such negligent and improper manner as to cause such lots as had been separately stowed to be broken up and become mixed. It is alleged that the entire freight for the cargo was paid under protest, and that in order to prevent further mixing in discharge of the cargo the stevedore

was paid extra compensation by the libelant without prejudice to its rights. The owner as claimant denies any contract or agreement to load, stow, carry, or deliver the cargo in separate lots, and claims that the charter party constituted the whole contract between the shipper or its consignee and the steamship, and that no provision for stowage and delivery in separate lots was contained in the charter party. The respondent alleges that the cargo was received, loaded, and discharged according to the terms and conditions of the charter party, and admits the payment of freight under protest and the employment of the stevedore by the shipper without prejudice.

In case No. 56, Edgar Luckenbach, owner of the steamship Jacob Luckenbach (as well as of the F. J. Luckenbach, the subject of libel in suit No. 51), filed a libel for freight in the sum of $5,250 against 500 tons of scrap iron which had been carried from New Orleans and Galveston to Philadelphia on the steamship Jacob Luckenbach as part of a cargo of 2,650 tons of scrap iron at $3.75 per ton under a charter party dated August 15, 1909, and entered into by the libelant through his agent, Arthur H. Page Company, Limited, with the Phœnix Iron & Steel Company. The total freight claimed is $10,500 less $5,250 paid by the Phœnix Iron & Steel Company, charterer. The Phœnix Iron & Steel Company in its answer sets up in defense as to the cargo carried by the Jacob Luckenbach substantially the same facts as are set up in the libel in case No. 51 as to the cargo carried by the F. J. Luckenbach, and further avers that the steamship refused to accept part of the cargo tendered at Galveston amounting to 346 tons of pig iron. The answer sets up that, by reason of the negligent and improper loading, stowage, and delivery of that part of the cargo which was delivered and the refusal to accept 346 tons of scrap iron tendered, the claimant has been damaged in the sum of $5,455.05, being in excess of the amount claimed by the libelant.

I find the following facts from the pleadings and evidence:

(1) The cargoes of scrap iron were tendered and delivered to the boats in separate lots according to grade and classification.

(2) Scrap iron consists of numerous distinct grades and classes each of which has its own use and price, and when the grades or classes of scrap iron are mixed the respective grades and classes lose their character and value as such.

(3) Although the scrap iron carried from Galveston was tendered to the boats in separate lots according to grade and classification, Edgar F. Luckenbach, the owner and claimant in suit No. 51 and the libelant in No. 56, through his stevedore, failed to load, stow, and deliver the cargoes in separate lots according to grade and classification as tendered and delivered to the boats, and mixed the grades and classes in loading and discharging the cargo, whereby the value of the scrap iron was diminished.

(4) Arthur H. Page Company, Limited, was employed by Edgar F. Luckenbach as his agent to conduct the business in relation to the contract for carriage of the scrap iron by the boats and to obtain the execution of the charter parties by the Phœnix Iron & Steel Company, and authority to act in the matter for the owner was delegated to Jules C. L'Hote, vice president of the Page Company.

(5) Prior to the execution of the charter parties by the Phœnix Iron & Steel Company, Mr. L'Hote, as agent for Mr. Luckenbach, was informed by Mr. Leonard Joseph for the shipper that the cargoes of scrap iron consisted of separate lots according to grade and classification and were intended to be delivered by the consignee to purchasers in such separate lots, and Mr. L'Hote, acting for Arthur H. Page Company, Limited, as agent for Mr. Luckenbach, before and at the time of the execution of the respective charter parties, promised and agreed with Mr. Joseph, president of the Phœnix Iron & Steel Company, that the cargoes would be loaded, carried, and delivered in separate lots according to grade and classification if so tendered to the boats, and represented to Mr. Joseph that such stowage and delivery was the custom of the ports of New Orleans and Galveston, which custom rendered it unnecessary that the charter parties should contain a covenant or agreement to that effect. Mr. Luckenbach, prior to the loading of the boats, knew that the cargoes were to be delivered in separate lots for loading and stowage in separate lots and did not then refuse to so load and stow.

(6) The representations, promises, and agreements of Mr. L'Hote made before and at the time of the execution of the charter parties induced Mr. Joseph to sign the name for the Phœnix Iron & Steel Company, and he did sign the same upon the faith of and relying upon the said promises, agreements, and representations.

(7) It is the custom of the Port of Galveston, from which the cargoes were shipped, where merchandise such as scrap iron is tendered and delivered to the boat in separate lots according to grade and classification, to load, stow, and deliver the same in separate lots according to grade and classification.

(8) The shipper supplied the steamships with sufficient dunnage for stowing the cargoes in separate lots as tendered and delivered to the boats.

Counsel for the shipper prior to the hearing, upon notice to counsel for the owner, moved to amend the pleadings so as to set up in the libel in one case and in the answer in the other case the custom of the ports of shipment. It was agreed by the parties at the time that the question of the amendment should be argued at the hearing and passed upon in connection with the decision of the whole case. For the reasons hereinafter stated, it is held that the custom of the port is material in construing the charter party. It does not change the cause of action nor set up a new cause of action. There can be no question of surprise, as testimony as to the custom had been introduced in the depositions long prior to the hearing. The amendments will accordingly be allowed.

The question to be determined in these cases is: "Was the shipowner required to stow, carry, and deliver the cargoes in separate lots as tendered to the vessels?" The charter parties contain no provision as to the manner in which the cargoes shall be loaded or discharged except the single provision: "Freight payable in cash at New York * * * on right delivery of cargo." If in the present case the evidence to show the agreement between the parties on the faith of which

213 F.—43

the contract was signed or to show the custom of the trade is admissible, the liability of the shipowner for damages arising from the indiscriminate mixing of the grades and classes of scrap iron follows.

[1] Counsel for the owner relies upon the well-known rule of evidence that a written instrument cannot be contradicted or varied by parol excepting in the cases of fraud, accident, or mistake. It is necessary, however, in order to construe a contract, to take into consideration the circumstances in connection with the subject-matter of the contract in order to explain the meaning of the written instrument as applied to its subject-matter. The determination of the question as to what constitutes "right delivery" under a contract of affreightment, and the question as to what the duty of stowage is where the charter party is silent on the subject, must depend in each instance upon the character of merchandise and goods to be carried. Bradley v. Packet Co., 13 Pet. 89, 10 L. Ed. 72; Thorington v. Smith, 8 Wall. 1, 19 L. Ed. 361; Maryland v. Railroad Co., 22 Wall. 105, 22 L. Ed. 713; Reed v. Insurance Co., 95 U. S. 23, 24 L. Ed. 348; United States v. Peck, 102 U. S. 64, 26 L. Ed. 46; Ogden v. Parsons, 64 U. S. (23 How.) 167, 16 L. Ed. 410.

If there were no custom of the Gulf ports in relation to separation of cargoes, which had been tendered or delivered separated into various grades and classes, and there had been no notice of any sort to the owner prior to delivery, then under the terms of the charter parties there would be some basis for the owner's contention that there was no obligation upon his part to keep the cargoes separate as delivered, although even under those circumstances it is doubtful whether a willful mixture of articles delivered separated according to grade and class would not have been a breach of the implied warranty of reasonable care to carry safely. Star of Hope, 17 Wall. 651, 21 L. Ed. 719.

Under the facts in this case, it appears that, before the charter parties were signed, the owner had notice, through his agent, Mr. L'Hote, vice president of Arthur H. Page Company, Limited, of the grading and classification, and separation, in accordance therewith, of the scrap iron, and that the owner's agent, moreover, was not only familiar with the custom of the ports as to stowage of merchandise so delivered, but expressly represented to the shipper that there was such custom, and that, in view of the custom, it would be unnecessary to insert in the charter parties any reference to separation and that the scrap iron would be loaded in separate lots as required by the shipper. Evidence of custom does not contradict or alter the terms of the contract, but interprets and fixes its meaning.

[2] In the absence of express stipulations, the usage of the trade is admissible where the written contract is silent upon any essential matter, not to contradict or vary its terms, but for the purpose of explaining its meaning and supplying details as to the manner in which it is to be carried out and executed. The custom proved in this case was one of the circumstances affecting the subject-matter and surrounding the parties to the transaction and in their minds when the contract was entered into and, under these circumstances, becomes part of the contract. Lamb v. Parkman, 1 Spr. 343, Fed. Cas. No. 8,020; Continental

Coal Co. v. Birdsall, 108 Fed. 882, 48 C. C. A. 124; Marx v. National
S. S. Co. (D. C.) 22 Fed. 680; Ogden v. Parsons, 64 U. S. (23 How.)
167, 16 L. Ed. 410.

[3] It is immaterial whether the knowledge of the custom or the
knowledge of the condition in which the scrap iron was to be delivered
were known to the shipowner, although it is shown that he was in-
formed of the latter before the loading began and acquiesced in the
agreement to load in separate lots. In these transactions the making
of the contract was delegated to Arthur H. Page Company, Limited,
as his agent, and everything done in connection with the contract was
transacted through their vice president, Mr. L'Hote. Mr. L'Hote's
knowledge was therefore binding upon his principal. Armstrong v.
Ashley, 204 U. S. 272, 27 Sup. Ct. 270, 51 L. Ed. 482. And he is
bound by representations made by his agent upon the faith of which
the contract was entered into. Cliquot's Champagne, 70 U. S. (3 Wall.)
114, 18 L. Ed. 116; El Paso L. S. C. Co. v. Colorado L. S. C. Co., 171
Fed. 20, 96 C. C. A. 262.

Both parties were familiar with the nature and character of the scrap
iron to be carried. It was delivered in separate lots by the shipper, and
sufficient dunnage was provided by the shipper for its separation in the
hold as delivered. It would be unreasonable to suppose that a shipper
of merchandise depending for its value upon its separation into grades
and classes, where the various grades and classes are intended and
fitted to be used for different purposes and in different kinds of mills,
would ship an assorted cargo unless he knew that it would be so loaded
as not to become a conglomerate mass unfit to be used by any mill
without regrading and reclassification. That Mr. Joseph, representing
the Phoenix Iron & Steel Company, did not agree that it should be so
carried, is shown by his calling Mr. L'Hote's attention to the condition
of the iron and declining to sign the charter parties unless such separa-
tion was made as would maintain the value of the goods. It was solely
in reliance upon the representations and promises of the owner's agent
that he was induced to enter into the charter parties, so that, even if
without the representation and agreement the custom of the port did
not govern the contract, it would be a fraud upon the shipper to per-
mit the enforcement of the terms of the charter parties in violation of
the agreement between the parties made at the time of its execution
and upon the faith of which it was entered into.

There is no sufficiently clear and definite evidence to establish a right
in the shipper to recover damages for failure upon the part of the Jacob
Luckenbach to accept and load part of the stipulated cargo of 3,000
tons nor to sustain the claim for iron alleged to have been lost over-
board in loading. Neither are sufficient grounds shown for recovery
of damages for failure to discharge the F. J. Luckenbach at the rate
of not less than 400 tons a day as provided in the charter party. Coun-
sel for shipper has not pointed out any circumstances rendering the
steamship liable for such delay. The shipper, in my opinion, is entitled
to damages arising from the improper stowage of the cargoes at Gal-
veston, including damages to the scrap iron caused by mixture of the
several grades and classes contained in the cargoes and the expense to

the shipper for employment of the stevedore at Philadelphia to prevent further mixture in unloading.

Decrees will be entered accordingly, and reference made to a commissioner to ascertain the shipper's damages.